UNITED STATES of America, Appellee,

v.

Ronald Bryce LAUGHMAN, Thomas E. Niehaus, Mitchell Dale Anglin, Daniel N. Donnelly, Waldamar Ebert, Larry Kim Michael Coffey, James Edward Marchant, Kenneth David Jester, and Richard Steve Carr, Appellants.

No. 78–5153.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1979.

Decided April 11, 1980.

Henry E. Sheldon, Cincinnati, Ohio, William C. Oldfield (James L. Cobb, W. Robert Lotz, Jr., Covington, Ky., on brief), for appellants.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S. C. (Thomas E. Lydon, Jr., U. S. Atty., Columbia, S. C., on brief), for appellee.

Before BUTZNER and PHILLIPS, Circuit Judges, and HOFFMAN\*, District Judge.

WALTER E. HOFFMAN, District Judge:

The appellants were charged under an indictment alleging one count of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846, and one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The matter went to trial before the court, without a jury, on February 21 and 22, 1978. Each of the appellants was convicted of both counts.

The pertinent facts are as follows: On the morning of July 26, 1977, Customs Patrol Officer McDonald received information about suspicious activities at the Buck Hall Campground located north of Charleston, South Carolina. Acting on this information, McDonald took his car and proceeded north on Highway 17 towards Buck Hall Campground. Along the way he encountered two pickup truck-campers bearing out-of-state license plates, one an orange Chevy and the other a brown Ford pulling a boat.[1] By 10:45 the same morning, surveillance was established at the Ramada Inn, North Charleston, where both campers had parked. A blue Chevy camper bearing Ohio license plates, apparently being driven by the same individual who had been driving the brown Ford, was also observed.

During the day various people, including appellants Donnelly and Jester, were seen working on the boat attached to the brown Ford. Appellants Ebert, Laughman, Anglin and Carr were observed coming and checking with the men at the boat.

At approximately 6:30 p. m. the brown Ford with the boat departed the Ramada Inn and proceeded north on Highway 17 towards Buck Hall. At approximately 7:15 p. m. the brown Ford entered the Buck Hall Campground. (Buck Hall Campground is about three-quarters of a mile off Highway 17. The campground is adjacent to the intracoastal waterway). There is a concrete boat ramp at the Buck Hall landing, and the brown Ford was observed backing the boat into the water, although it was not actually launched.

At approximately 7:55 p. m. a yellow pickup truck-camper with Kentucky tags came out of the campground and turned north on Highway 17. South Carolina State Law Enforcement Division (SLED) agents reported that the yellow pickup went to the area of McClellanville (located on the intracoastal waterway about seven miles north of Buck Hall) where it parked on a hill and appeared to use a C.B. radio. After about 30 minutes, the yellow camper returned to the campground.

McDonald, at approximately 10:15 p. m., entered the campground and set up an observation post on private property located about 200 yards from the boat ramp. He received word that the orange and blue campers had left the Ramada Inn, heading towards Buck Hall. From about 10:30 until midnight, the brown, orange and blue campers moved back and forth between Buck Hall and an area located about four miles further south on the intracoastal waterway. Eventually, the campers assembled at Buck Hall Campground.

During the evening of July 26th and the morning of July 27th, McDonald maintained radio contact with various other Customs, SLED and Drug Enforcement Administration (DEA) agents in the area. The evening was very dark and rainy. At about midnight McDonald and other officers heard an outboard motor. They were able to discern a rather large Zodiac type rubber boat moving south along the waterway. The boat contained two individuals and a "mound of indistinguishable cargo." The boat proceeded south until it was out of sight.

About an hour later, the officers observed a sailing vessel of the "Columbia type"

---

\* The Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. At trial McDonald described these vehicles as the type typically used to haul large quantities of marijuana.

moving south on the waterway. The sailboat was moving "very quietly" and without running lights. Two Zodiac rubber boats (the same types as observed earlier) were tied alongside the sailboat.

The sailboat proceeded south past McDonald and appeared to drop anchor. There was a lot of activity on and around the sailboat. According to McDonald a barge or tug boat appeared in the waterway to the south prompting the sailboat and the rubber boats to turn and head north. McDonald observed three of the rubber boats, all containing large mounds of indistinguishable cargo.

McDonald then observed the rubber boats going ashore in the area of the boat ramp at Buck Hall. Shortly thereafter, the rubber boats reappeared, no longer containing any cargo. At about the same time the engines of several trucks started up and the vehicles departed the campground. McDonald advised the other units that the campers were leaving and to follow closely.

When the campers departed, McDonald ordered two officers, who were heading north on the waterway in a DEA boat, to continue north and board the sailboat. McDonald had intended that the DEA boat pick up himself and another officer prior to boarding the sailboat; however, when he observed that one camper was still at the boat ramp, he decided that he should investigate the camper. Accordingly, he advised the DEA boat to proceed without him.

McDonald went to the boat ramp, where he found the brown camper along with two individuals, Ebert and Anglin. Ebert was in the cab of the camper and Anglin was next to the boat ramp. Two of the rubber boats had been pulled up on the boat ramp and McDonald observed a large amount of what appeared to be marijuana residue in the boats and on the ramp. Upon discovering the marijuana residue, McDonald notified the other units by radio that the boats did, in fact, contain marijuana. McDonald testified that he advised the officers in the DEA boat of his discovery prior to their boarding of the sailboat (although the officers on the boat did not recall receiving such a message prior to boarding).

McDonald arrested Ebert and Anglin. Found in Ebert's possession at the time of his arrest was identification for appellant Laughman. Marijuana residue was subsequently discovered in the brown camper.

Acting on McDonald's instructions, Customs Patrol Officers Bell and Garcia boarded the sailing vessel ABRAXIS in the intracoastal waterway. Marijuana residue was found on board, along with appellants Niehaus, Marchant and Coffey. Two of the large rubber boats were tied alongside the vessel.

The campers that had departed the campground (between 2:30 and 3:00 a. m. on the 27th) were followed by units positioned near the entrance to the campground. The blue Chevy camper was followed south on Highway 17 to the parking lot of the Knights Inn, which is located across from the Ramada Inn in North Charleston. Appellant Donnelly was observed parking the blue camper. Later, pursuant to a valid search warrant, the blue camper was entered and found to contain in excess of 3000 pounds of marijuana.

The orange and yellow campers departed Buck Hall Campground together shortly after the blue camper. The two campers proceeded south on Highway 17 followed by Customs Patrol Officers and SLED agents. After hearing McDonald announce that he had discovered marijuana residue, the officers stopped both campers. The orange pickup contained the appellants Carr and Jester, as well as over 1100 pounds of marijuana.

The yellow camper was driven by appellant Laughman. At trial, SLED Agent Caldwell testified that the rear of the yellow camper contained one of the rubber boats, partially deflated, along with some marijuana residue. Later in the trial it was established that what Agent Caldwell had observed in the rear of the yellow camper was not a boat, but rather was one or more covers for the Zodiac type rubber boats. Agent Caldwell also testified that although he found marijuana residue, he took no

samples; at trial no marijuana samples were introduced from the yellow camper.

Appellants challenge the district court's actions on several grounds. First, they argue that the warrantless search of the sailing vessel ABRAXIS was unlawful and that the court erred in admitting evidence obtained from the vessel. Next, they challenge the admissibility of evidence obtained by a warrantless search of luggage found inside the brown pickup truck-camper. The appellants also contend that the court erred in refusing to direct a verdict of acquittal at the close of the government's case because the evidence was insufficient to support convictions on either of the charges alleged in the, indictment. Finally, appellant Laughman contends that perjured testimony served as the basis for his conviction.

## I.

■ The appellants maintain that the boarding of the sailing vessel ABRAXIS in the intracoastal waterway was unlawful in that the boarding officers lacked sufficient probable cause to believe that the vessel contained contraband or had been engaged in the illegal transportation of contraband.[2]

Officers have probable cause to search whenever "the facts and circumstances within their knowledge, and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that [contraband] . . . was being transported in the [vehicle] . . . which they stopped and searched." *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *see Brinegar v. United States*, 338 U.S. 160, 171, 69 S.Ct. 1302, 1308, 93 L.Ed. 1879 (1949); *see also Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (probable cause to make an arrest).

■ As a preliminary task, we must decide whether the knowledge of Officer McDonald, who was in charge of the investigation and who ordered the boarding, can be imputed to the boarding officers, Bell and Garcia. The law seems to be clear that so long as the officer who orders an arrest or search has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts.[3] Therefore, if the knowl-

---

**2.** Customs officials may conduct routine warrantless border searches at international borders or their "functional equivalent" regardless of whether there exists probable cause to believe that a customs violation has occurred. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1972). However, there cannot be an *Almeida-Sanchez* border search without some degree of probability that the vessel has crossed a border; i. e., the officials must possess some articulable facts tending to show that the vessel has recently crossed an international border. *United States v. Whitmire*, 595 F.2d 1303, 1307 (5th Cir. 1979); *United States v. Johnson*, 588 F.2d 147, 154 (5th Cir. 1979); *United States v. Williams*, 544 F.2d 807, 811 (5th Cir. 1977). The sailing vessel ABRAXIS was first sighted on the intracoastal waterway. There was nothing which would indicate that the vessel had recently crossed an international border. For that reason, the boarding of the ABRAXIS cannot be justified as a routine border search conducted at the "functional equivalent" of a border. In realization of this the government seeks to justify the warrantless boarding and subsequent search of the vessel on the grounds that there existed probable cause to believe

that the vessel was involved in illegal activity and that the mobility of the sailing vessel made the procurement of a warrant impracticable.

**3.** When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in · determining whether there was probable cause. Likewise, when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest. *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977), 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), and 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270 (1977); *see also United States v. Loundmannz*, 472 F.2d 1376 (D.C.Cir. 1972), *cert. denied*, 410 U.S. 957, 93 S.Ct. 1431, 35 L.Ed.2d 691 (1973); *United States v. Trabucco*, 424 F.2d 1311 (5th Cir.), *cert. denied*, 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785 (1970); *United States v. Pitt*, 382 F.2d 322, 324 (4th Cir. 1967) ("Probable cause . . . can rest upon the *collective* knowl-

edge possessed by Officer McDonald was sufficient to establish probable cause, it is inconsequential that Bell and Garcia may not have been totally aware of that knowledge. Accordingly, we should examine the situation as it appeared to Officer McDonald.

A number of out-of-state camper vehicles (of the type typically used to haul large quantities of marijuana) had been observed in and around the Buck Hall Campground from early on the morning of July 26th until the early morning of July 27th. From about 10:30 p. m. until midnight on July 26th, there was activity between the Buck Hall Campground and an area located about four miles south along the intracoastal waterway. Shortly after midnight, McDonald observed a rubber boat containing two people and "a mound of indistinguishable cargo" heading south on the intracoastal waterway. At approximately 1:15 a. m. on the morning of the 27th, McDonald saw the ABRAXIS proceeding south in the intracoastal waterway. The vessel had no running lights, even though it was a dark and rainy night, and there were two rubber boats tied alongside. McDonald observed a lot of activity in and around the ABRAXIS. He observed three rubber boats, each carrying a large mound of indistinguishable car-

go, moving from the ABRAXIS to the Buck Hall boat ramp, where they deposited their cargoes. Shortly thereafter, the campers began departing from the area of the boat ramp.[4]

In our opinion, the above facts were sufficient to induce a reasonable person to believe that contraband was being transported in the ABRAXIS. Therefore, we find that Officer McDonald had sufficient probable cause to order Officers Bell and Garcia to stop and board the vessel for the purpose of conducting a search. *See United States v. Caraballo*, 571 F.2d 975, 977 (5th Cir. 1978) ("Probable cause exists if the 'facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been [or is being] committed . . . .' ") (quoting *Stacey v. Emery*, 97 U.S. 642, 645, 24 L.Ed. 1035 (1878)). That the search was conducted without a warrant is justified by the exigent circumstances arising out of the mobility of the vessel. *United States v. Caraballo*, 571 F.2d at 977; *United States v. Cadena*, 585 F.2d 1252, 1263 (5th Cir. 1978); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).[5]

edge of the police, rather than solely on that of the officer who actually makes the arrest.")

4. At this point McDonald ordered Bell and Garcia to pick him up so that he could help them board the ABRAXIS. But when he noticed that one of the campers had remained at the boat ramp, he decided to investigate the camper. Accordingly, he ordered Bell and Garcia to stop and board the ABRAXIS without him. McDonald proceeded to the boat ramp, where he discovered the brown Ford and two of the rubber boats, each containing a quantity of marijuana residue. McDonald immediately notified Bell and Garcia of his discovery by radio.

At trial, McDonald insisted that he had discovered the marijuana residue prior to the boarding of the ABRAXIS. If his discovery of the marijuana preceded the boarding of the sailing vessel, then there is no question but that McDonald possessed sufficient knowledge to establish probable cause. Appellants concede this; nevertheless, they maintain that the boarding took place before the discovery of the marijuana residue. (Appellants' contention is bolstered by the fact that, at trial, neither Bell

nor Garcia were able to confirm having heard McDonald's announcement of his discovery on the radio.) Appellants further contend that without the discovery of the marijuana residue by McDonald, the facts are insufficient to establish probable cause; therefore, argue appellants, the boarding took place without probable cause.

Whether McDonald discovered the marijuana residue before or after the boarding of the ABRAXIS took place is a factual question which we are unable to resolve on the basis of the record before us. However, we see no necessity for resolving this question, inasmuch as we find that McDonald had sufficient probable cause to stop and board the ABRAXIS prior to his discovery of the marijuana residue.

5. A finding that the boarding of the ABRAXIS was justified by the probable cause-exigency exception to the warrant requirement renders it unnecessary for us to explore alternative rationales which might support the boarding. This is not to say that such rationales do not exist. For instance, in the proper case customs

## II.

Several hours after the arrests of Ebert and Anglin at the boat landing, but before arriving at the Customs House, Customs Patrol Officer Puig conducted a second cursory search of the interior of the brown pickup truck. In the rear of the truck he found a green duffel bag containing some incriminatory charts and note pads. This evidence was subsequently introduced at trial over the objections of the appellants. Appellants maintain that the warrantless search of the duffel bag was unlawful; therefore, argue appellants, the court's refusal to suppress the contents of the bag amounts to reversible error.

Upon examining the record, we find that the contents of the green duffel bag were not considered by the court in determining the guilt or innocence of the appellants.[6] Therefore, the court's refusal to suppress that evidence, if error at all, was harmless.

## III.

Appellants contend that the government failed to establish beyond a reasonable doubt that a conspiratorial agreement existed. They argue that some of their convictions were based solely on guilt by association.

We have stated that the gist or gravamen of the crime of conspiracy is an *agreement* to effectuate a criminal act. *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir. 1975), *cert. denied*, 423 U.S. 1088,

96 S.Ct. 881, 47 L.Ed.2d 99 (1976). We also recognize that the existence of a conspiratorial agreement need not be proven by direct evidence, but may be inferred from the facts and circumstances of the case, i. e., circumstances indicating that two or more persons acted in concert to achieve an illegal goal. *Ianelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Godel*, 361 F.2d 21 (4th Cir.), *cert. denied*, 385 U.S. 838, 87 S.Ct. 87, 17 L.Ed.2d 72 (1966).

In *United States v. Alvarez*, 548 F.2d 542 (5th Cir. 1977), "the presence of seven men working under cover of darkness on the banks of the Rio Grande to unload 1,600 pounds of marijuana which was floated across the river '[was] sufficient to show a concert of action, all parties working together understandingly, with a single design . . . .'" *Id.* at 544 (quoting *United States v. Prout*, 526 F.2d 380, 385 (5th Cir. 1976)). In the present case, the evidence establishes beyond a reasonable doubt that over two tons of marijuana were transferred from the sailing vessel ABRAXIS to vehicles waiting at the Buck Hall boat landing. Of necessity the facts and circumstances amply demonstrate the existence of a common plan or purpose shared by at least some of the nine appellants. Undoubtedly, there existed an unlawful agreement, or conspiracy, to possess and distribute a sizeable quantity of marijuana.[7]

---

officers may be allowed to halt vessels sighted in intracoastal waterways for document checks and safety boarding. *See United States v. Whitmire*, 595 F.2d at 1315; *see also* 19 U.S.C. § 1581(a). The ABRAXIS' lack of running lights on a dark and rainy night may have justified such a boarding. In addition, the totality of the circumstances may have given rise to a "reasonable suspicion" of illegality which, under the Supreme Court's opinion in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), would justify a limited investigatory stop. Once on board, the presence of marijuana in plain view on the deck would have been adequate reason for further investigation.

6. The following conversation took place between the court and the Assistant United States Attorney with respect to the contents of the green duffel bag:

> MR. LOFTON: In order not to give the Court any concern with reference to the other documents, the other documents we introduced, the maps and the charts, at this time we would withdraw those.

> THE COURT: Let the record show the Court has . . . never seen the exhibits which you now withdraw . . . ..

7. The amount of marijuana involved (over two tons) sufficiently establishes that there was an

Simply proving the existence of a conspiracy, however, cannot sustain a verdict against an individual defendant. There must also be a showing of that defendant's knowledge of the conspiracy's purpose and some action indicating his participation. *United States v. Falcone*, 311 U.S. 205, 210–11, 61 S.Ct. 204, 206–207, 85 L.Ed. 128 (1940); *United States v. Prince*, 515 F.2d 564, 567 (5th Cir.), *cert. denied Craft v. United States*, 423 U.S. 1032, 96 S.Ct. 563, 46 L.Ed.2d 406 (1975). These elements, knowledge and participation, may also be proven by circumstantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Harris*, 409 F.2d 77, 83 (4th Cir.), *cert. denied sub nom. Brown v. United States*, 396 U.S. 965, 90 S.Ct. 443, 24 L.Ed.2d 430 (1969), and *Venning v. United States*, 396 U.S. 965, 90 S.Ct. 447, 24 L.Ed.2d 430(1969).

Accordingly, we must review the evidence against each appellant and determine whether it is sufficient to sustain a conspiracy conviction. In doing so, we shall bear in mind that the evidence and all reasonable inferences arising from it must be viewed in the light most favorable to the government, the prevailing party. *Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Godel*, 361 F.2d at 23; *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (Our initial inquiry in determining whether, on review, the evidence was sufficient to support a criminal conviction is whether after "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

Appellants Niehaus, Marchant and Coffey were arrested aboard the sailing vessel ABRAXIS. A search of the vessel and the Zodiac boats attached to it revealed marijuana residue. When first observed, at approximately 1:15 a. m., the ABRAXIS had

intent to distribute *See United States v. Villarreal*, 565 F.2d 932, 937 (5th Cir.) *cert. denied*,

been proceeding south on the intracoastal waterway. Although it was dark the vessel had no running lights. A lot of activity was observed in and around the sailboat. When another vessel appeared further south on the intracoastal waterway, the ABRAXIS turned and headed north. Several large Zodiac rubber boats, carrying what can be assumed to be large quantities of marijuana, moved from the ABRAXIS to the Buck Hall boat ramp, where the marijuana was loaded onto the campers waiting on shore. At the time of boarding Niehaus was at the helm. The obvious inference is that he was aware of the presence of the marijuana and that he was, in fact, actively participating in its delivery. The trial judge could reasonably have concluded that the presence of such a large quantity of marijuana on a sailboat the size of the ABRAXIS could hardly have escaped the attention of appellants Marchant and Coffey. Moreover, the hour, the place of apprehension, the lack of running lights and other furtive activity on and around the vessel all contribute to the inference that Marchant and Coffey shared in the enterprise. *See United States v. Whitmire*, 595 F.2d 1303, 1317 (5th Cir. 1979); *United States v. Weinrich*, 586 F.2d 481, 497–98 (5th Cir. 1978), *cert. denied sub nom. Blair v. United States*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979), and 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).

Appellants Ebert, Anglin, Carr, Jester, Donnelly and Laughman can all be placed at or near the Buck Hall boat landing during the time in which the marijuana was deposited on shore and loaded onto the trucks. Their association had become evident earlier in the day when they were seen moving about and conversing with one another in rooms at a motel and in the motel parking lot. Knowledge of and involvement in the conspiracy on the part of each individual appellant can be gleaned from the record.

439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).

Almost immediately after the delivery of the marijuana, Carr, Jester, Donnelly and Laughman left the area of the landing in three of the truck-campers. An inference may be made on the basis of the evidence that they had been present at the boat landing along with Ebert and Anglin. Throughout the evening customs officers, SLED and DEA agents maintained surveillance of the vehicles. When the campers entered the campground agents reported to Officer McDonald who, from his observation post, could see the headlights and forms of the campers as they congregated at the landing. Soon after the rubber boats were seen moving to shore, McDonald heard the campers start their engines and saw them depart the area of the boat landing. He reported to the agents stationed at the entrance who, in turn, followed the vehicles to the points at which they were stopped. At trial, the agents testified that upon leaving the campground, the orange and blue campers looked different, "weighted" or "sitting down in the back". Each of the campers was found to contain marijuana or other evidence of involvement in the enterprise.

 Carr and Jester were apprehended in a truck-camper which contained over 1100 pounds of marijuana. There is an inference that the driver of the vehicle has knowledge of the contraband within it, certainly when the amount of contraband is so large. *See United States v. Hood*, 493 F.2d 677, 681 (9th Cir.), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). Thus, Carr's knowledge can be drawn from the fact that he drove and had control of the vehicle. While there is no such inference on the part of a passenger, "where there is a rational basis for attributing an interest in the contraband to the passenger because of his relationship to the driver, his attitude, conduct or other probative circumstances, the trier of fact can infer sufficient knowledge to sustain a conviction . . . ." *Id.* Here, the circumstances certainly indicate that Jester was more than just a temporary passenger. His obvious comradery with the other appellants, the time of night, the surreptitious

activity observed, and the large quantity of marijuana involved provide ample evidence to constitute a rational basis for attributing an interest in the marijuana to Jester. *See United States v. Gomez*, 529 F.2d 412, 419 (5th Cir. 1976).

 Donnelly was observed to be in control of a camper containing over 3000 pounds of marijuana. Laughman was arrested while driving a pickup containing covers for the Zodiac boats which were used to carry the marijuana from the ABRAXIS to shore. Ebert was apprehended while in the cab or the brown camper located at the boat landing and found to contain marijuana residue and pieces of the Zodiac rubber boats. Anglin was arrested while standing at the head of the boat ramp and in close proximity to two Zodiacs, each containing marijuana residue. "Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy." *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977). Here, the evidence establishes beyond a reasonable doubt that each of the appellants was connected in some way with a conspiracy to possess and distribute marijuana. Therefore, we find that their convictions on the conspiracy count should be affirmed.

## IV.

Appellants argue that there is insufficient evidence to sustain their convictions of possession with intent to distribute. As with the conspiracy charges, we must view the evidence and all reasonable inferences arising from it in the light most favorable to the government. *Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469.

 Once it is established that a defendant is a participant in a conspiracy to possess and distribute a controlled substance, he need not have actual possession of the controlled substance to be guilty of the substantive charge of possession with intent to distribute. Constructive posses-

sion is sufficient. *United States v. Gomez,* 529 F.2d 412, 419 (5th Cir. 1976); *United States v. Horton,* 488 F.2d 374, 381 (5th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). Constructive possession exists when the defendant exercises, or has the power to exercise, dominion and control over the item. *United States v. Phillips,* 496 F.2d 1395, 1397 (5th Cir. 1974), *cert. denied,* 422 U.S. 1056, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975). In addition, "[p]ossession need not be exclusive, but may be shared with others, and is susceptible of proof by circumstantial as well as direct evidence." *United States v. Mendoza,* 433 F.2d 891, 896 (5th Cir. 1970), *cert. denied,* 401 U.S. 943, 91 S.Ct. 953, 28 L.Ed.2d 225 (1971). In the present case, we agree with the trial judge that the evidence establishes beyond a reasonable doubt that all of the appellants were engaged in a concerted effort to transport and distribute over two tons of marijuana.[8] And while all of the appellants may not have had actual physical possession when they were apprehended, they each retained an interest in and dominion over the marijuana.[9]

Appellants Niehaus, Marchant and Coffey were apprehended while on the deck of a sailing vessel found to be carrying marijuana residue. The vessel had just completed a rendezvous at night with the other appellants. It is true that merely being a passenger in proximity to contraband is not enough to constitute constructive possession; *see e. g., United States v. Ferg,* 504 F.2d 914, 916–17 (5th Cir. 1974); however, "where other circumstantial evidence . . . is sufficiently probative, proximity to contraband coupled with inferred knowledge of its presence will support a finding of guilt on such charges." *United States v. Whitmire,* 595 F.2d 1303, 1316 (5th Cir. 1979). The presence of over 4000 pounds of marijuana could hardly have escaped the attention of anyone aboard the ABRAXIS. Other evidence, such as the hour, the place, the surreptitious activity observed, and the need for manpower sufficient to unload two tons of marijuana into three or four rubber boats without losing control of the sailboat in the wind and current of the intracoastal waterway all contribute to the inference that Niehaus, Marchant and Coffey shared in the undertaking. *Id.* at 1317. We find the evidence of their guilt sufficient.

Carr was arrested while operating a truck-camper which contained more than 1100 pounds of marijuana. Donnelly was found to have control of a camper which contained over 3000 pounds of marijuana. Under the circumstances, it seems inconceivable that they could have been acquitted of possession.

There was also ample evidence to constitute attributing an interest in the marijuana to both Jester and Laughman. *See United States v. Hood,* 493 F.2d 677, 681 (9th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). Both were present at the Buck Hall boat landing when the marijuana was delivered. Jester was in the orange camper with Carr at the time of their arrests. An inference could properly be drawn that Jester, as well as Carr, was aware of the existence of the marijuana and that they were in joint possession. *Id.*

---

8. The trial judge made the following finding: Just the general overall picture I think it would be incredible to believe in my opinion that anything but all of these Defendants were engaging in a concerted effort as partners in crime for violating the law and they were aiding and abetting each other and helping and participating in the activity and that they had in their possession, all of the Defendants, working together, that while all of them didn't have physical possession of the marijuana, that there was possessed by them together this marijuana and that they're guilty, all nine of them, as the Government has proved beyond a reasonable doubt, has proved that each of the Defendants, and I've considered each of the Defendants' cases, that they're guilty beyond a reasonable doubt as to both counts in the indictment based on the evidentiary ruling that I've made.

9. We note that one who aids and abets in the commission of a federal offense may be convicted as a principal. 18 U.S.C. § 2; *United States v. Peterson,* 524 F.2d 167, 174 (4th Cir. 1975), *cert. denied,* 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976).

Laughman was arrested while operating a camper which carried covers for the Zodiac boats. He was observed leaving the landing in tandem with the vehicle operated by Carr. "The large amount of marijuana supported a finding of a working relationship among several people which along with the setting, constituted sufficient evidence for constructive possession." *United States v. Gomez*, 529 F.2d at 419.

Ebert and Anglin's presence at the boat ramp during the time in which the marijuana was transported to shore, and the marijuana residue and Zodiac rubber boats found in their apparent possession, support a finding that they retained an interest in and constructive possession of the total quantity of marijuana. Under the circumstances, we find the evidence sufficient to convict each of the appellants of the substantive charge of possession with intent to distribute.

### V.

■ Appellant Laughman contends that his conviction should be reversed because it was based solely upon perjured testimony. Apparently, the officers who arrested Laughman testified that they found a deflated Zodiac rubber *boat* in the rear of the yellow camper driven by Laughman when, in fact, it was one or more *covers* for the Zodiac boats. There is no merit to Laughman's contention. The record clearly shows that when the trial judge made his finding of guilt, he was fully aware of the true nature of the evidence. The judge was convinced that the officers had simply made "an honest mistake." Clearly, Laughman's conviction was not based upon perjured testimony.

AFFIRMED.