836 F.2d 547
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES Of America, Plaintiff-Appellee,
v.
Richard ADAMS, Defendant-Appellant.
 No. 87-5531.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 6, 1987.
Decided Dec. 16, 1987.
 
 Betty Molchany for appellant.
 John Thomas Martin, Assistant United States Attorney (Henry E. Hudson, United States Attorney on brief) for appellee.
 Before HARRISON WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and FRANK A. KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Richard Adams was convicted of conspiracy to steal government property. He was the principal employee in the vault of a General Services Administration ("GSA") warehouse depot while significant amounts of government property were stolen from the vault. The government's prosecution of Adams and others for the unauthorized disappearance of such property grew out of an undercover investigation by the Federal Bureau of Investigation ("FBI"). On appeal, Adams contests the denial of his motion for a new trial. Most of Adams' complaints about his trial, such as his attorney's protestations that the jury was negatively influenced by the judge's comments during the trial directing her to speed up her examinations of witnesses, are frivolous.
 
 
 2
 One claim meriting consideration on appeal is the contention that the evidence was insufficient to support the verdict. While the evidence is indeed thin, it is by no means insubstantial enough to merit setting aside the jury verdict.
 
 
 3
 Adams was an employee of ARA Services, Inc., which contracted with the GSA to handle receiving, shipping and storage of GSA supplies and equipment at the GSA warehouse facility in Springfield, Virginia. Howard Luker, a Federal Bureau of Investigation agent, posed as a truck driver and went by the name of William, or Billy, O'Neil. From March to September, 1986, Luker bought GSA property from Harold Johnson (Harold), another ARA employee. In August, 1986, Luker asked Harold about the possibility of buying power tools. The tools were in the vault, a fenced-in area within the warehouse, where expensive items were kept and access was limited to authorized personnel. Luker proposed buying vault property during Luker's next trip, on September 4, 1986. Harold said that was not possible because his contact in the vault would be on vacation on September 4. Adams was on vacation on September 4. It was agreed that a theft of vault property would be arranged for September 10. Adams had, by that time, returned from vacation. Harold, James Johnson, and Arthur Williams loaded Luker's truck with more than $40,000 worth of property. After the theft, carrying a transmitter and tape recorder, Luker followed Harold to Colonial Beach, to transfer the goods to a truck owned by Harold's wife's cousin, Thomas Wise. Harold and Wise were arrested at the scene. Adams was arrested October 28.
 
 
 4
 Criminal charges were brought against Harold, James Johnson, Williams, Wise, Lionel McDowney, and Adams. During the fall, Harold pleaded guilty and was sentenced to about one year. Adams was indicted with McDowney, Williams, and Wise. Betty Molchany was court-appointed to represent Adams, and the other defendants retained other counsel. Adams was, under 18 U.S.C. Sec. 371, indicted on November 20, 1986 for conspiracy to steal government property and arraigned on November 26. Trial was set for February 4, 1987. Defense counsel was given 10 days to file motions, with argument on motions set for January 23.[1] After that January 23 hearing, the judge ordered the government to make the Depot's vault sign-in log available to the defense. The log was filed with the court on January 28. The district court further ordered that any Jencks Act materials not already disclosed were to be provided to the defense by 5:00 pm on February 2. McDowney and Williams pleaded guilty on January 30. Adams was tried on February 4 and 5 with Wise. Wise was acquitted, but Adams was convicted of conspiracy. Adam's motion for acquittal was denied after the government's case and after the close of evidence. The sentencing report was made available March 4, and sentencing took place March 6.
 
 
 5
 Adams in his Brief stated,
 
 
 6
 Adams does not rely on any one single issue in support of his contention that his conviction should be reversed. Rather, it was the combination of the court's schedule requirements, the tenor of the court's comments against his counsel, and the overall circumstances of the trial.
 
 
 7
 Adams' specific complaints are discussed below.
 
 
 8
 I. Were the trial judge's comments about Adams' counsel in the jury instructions, and to Adams' counsel during trial, inflammatory and prejudicial to the defendant?
 
 
 9
 As part of the jury instructions, after telling the jury it was to evaluate the testimony of the witnesses, the district judge told the jury,
 
 
 10
 I have on occasion been a little harsh on Ms. Molchany because of what I perceived to be her deliberateness in presenting the case. You are not to draw any inference against her client because of my remarks to her.
 
 
 11
 Adams argues that the curative instruction itself was prejudicial to him because of the "negative connotations" associated with the word "deliberateness." To state the argument is to reveal its flimsiness. Deliberateness in a lawyer may be a virtue, not a vice. In any event, the jury heard clearly that Adams, not Molchany, was on trial.
 
 
 12
 Adams also complains about other statements made by the district judge during trial. We have reviewed the trial transcript, and our review has failed to reveal anything that attains objectionable proportions. The district judge interrupted counsel for both sides with about the same frequency, and always directed his comments to the particular questions or activity going on and not to the individual counsel or their clients.
 
 
 13
 For example, Adams complains that Molchany's cross-examination about the operation of forklifts and pallets was unfairly interrupted. When Molchany started eliciting an explanation of how forklifts work, the district judge said, "I wonder what the relevance of this is, how to operate a forklift and a pallet?" After Molchany responded that it was relevant to how items were removed from the vault, the trial judge said, "Let's move through it very fast, because how to operate a forklift and a pallet really is not a complicated matter." Adams does not argue that his attorney was prevented from bringing in some exculpatory evidence; rather, he seems to argue that the very fact that the judge interrupted and corrected or directed his attorney harmed his standing with the jury. However, the judge's actions do not constitute reversible error. We have stated, "the judge has the right, and often an obligation, to interrupt the presentations of counsel in order to clarify misunderstandings or otherwise insure that the trial proceeds efficiently and fairly." United States v. Cole, 491 F.2d 1276, 1278 (4th Cir.1974). See United States v. Head, 697 F.2d 1200, 1210 (4th Cir.1982) (while Court was troubled by conduct of trial, with 2,470 interjections by trial judge over five days, Court could not conclude the defendant's fair trial rights were prejudiced), cert. denied, 462 U.S. 1132 (1983); United States v. Johnson, 657 F.2d 604, 606 (4th Cir.1981) ("fair analysis of the transcript indicates clearly that the efforts of the judge were in the interest of expediting the case, and were within the legitimate bounds of comment by the trial court in the course of the proceedings").
 
 
 14
 Another complaint of Adams is that the judge did not permit his attorney to play a tape of a conversation between Luker, the FBI agent, and Harold. In fact, the judge allowed her to fiddle with the tape recorder for about a half hour in open court. She played a tape up to the microphone, but it was not clear enough to understand. She then tried another tape recorder provided by the court, but couldn't find the right place and the tape was still partly inaudible. The trial judge properly told her that she should have had a transcript made of the portion she wished to put into evidence. We do not think Adams was prejudiced by the failure to present the tape or a transcript clearly to the jury, because the government put Agent Luker on the stand and questioned him about the portion of the conversation in question; the tape was played to Luker; the trial judge then offered to let Molchany play that portion of the tape again; she did so, and when the judge asked if she wished to play other portions, she declined. It appears, therefore, that all relevant information on the tape was given to the jury.
 
 
 15
 In sum, we have not found anything in the trial transcript that is improper, let alone prejudicial to the defendant.
 
 
 16
 II. Was the jury improperly instructed on witness credibility?
 
 
 17
 Adams complains that the district court's jury instructions inadequately addressed the issue of prior inconsistent statements by a witness, and that when the judge added such an instruction at defense counsel's request, the additional instruction was inadequate.
 
 
 18
 In the district court's jury instructions, the judge gave general guidance on evaluating the credibility of witnesses, including the fact that the testimony of accomplices "is open to suspicion." The judge also instructed the jury regarding "[i]nconsistencies or discrepancies in the testimony of a witness," and the general credibility of witnesses, including "whether the witness impresses you as having an accurate recollection of those matters."
 
 
 19
 Adams has argued,
 
 
 20
 [t]he trial court's summary reference to the jury's consideration of inconsistent statements and conduct, at [sic] instruction added at defense counsel's request, likely conveyed message to jurors that instruction was of little significance and could be disregarded.
 
 
 21
 After defense counsel objected to the lack of specific instructions on prior inconsistent statements, the judge recalled the jury and stated:
 
 
 22
 Counsel called to my attention that I did not tell you during the charge that in assessing the credibility of a witness, you might consider any prior inconsistent statements of a witness if proven by the evidence; and I do supplement the charge to that extent.
 
 
 23
 We find no inadequacy or prejudice in the district court's instructions.
 
 
 24
 III. Was the evidence insufficient to support the jury's verdict?
 
 
 25
 The evidence against Adams at trial consisted of testimony by Harold and Williams that they took property from the vault on September 10 in Adams' presence and with his help. Such testimony was corroborated by Adams' being on vacation September 4 but present on September 10, and by Harold's statements to Agent Luker and at trial that Adams, his "man in the vault," would be on vacation September 4 so the theft had to be postponed to September 10. Adams duly challenged the credibility of Harold and Williams, and at trial presented evidence that Adams was a good employee who had reported past attempted thefts. Adams' attorney also established at trial that there had been other thefts from the vault, in an effort to show that thefts could occur without Adams' connivance. The evidence of guilt was, therefore, weak, as it tended in two opposite directions, but under the law it was sufficient to support the jury's verdict.
 
 
 26
 In reviewing the denial of a motion for acquittal, we must determine whether the evidence, when viewed in the light most favorable to the government, is sufficient so that any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Flowers, 813 F.2d 1320, 1324 (4th Cir.1987). Here, evidence was presented at trial that Adams was in the vault when the government property was stolen September 10, and that he had to let the thieves in and was in charge of regulating all withdrawals from the vault. The standard for judging the sufficiency of evidence proving a defendant was a co-conspirator is as follows:
 
 
 27
 Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy.
 
 
 28
 United States v. Laughman, 618 F.2d 1067, 1076 (4th Cir.1980) (emphasis in original), cert. denied, 447 U.S. 925 (1980). The statements of a co-conspirator may be probative of the existence of a conspiracy as well as the participation of both the defendant and the declarant in the conspiracy. Bourjaily v. United States, 107 S.Ct. 2775, 2781 (1987). Here, the jury could have believed the testimony of Harold and Williams, despite the factors undermining their credibility. The Court does not second-guess the jury's judgment so long as the evidence is sufficient viewed in the light most favorable to the prosecution.
 
 
 29
 IV. Was Adams denied effective assistance of counsel because his attorney had insufficient time to prepare?
 
 Adams has argued:
 
 30
 Defendant loses effective aid of counsel when discovery is not provided until shortly before trial, a sudden reversal of a witness's [sic] position does not become known until two days before the trial, and counsel is unable, because of time constraints to interview government's key witnesses and the trial court's pace during the trial and pre-trial stages is such that it places an unreasonable burden on court-appointed counsel.
 
 
 31
 Adams' counsel requested a continuance the morning of trial, after the jury had been empaneled. The trial judge was unreceptive. She also tried to postpone making her opening statement, saying she was not prepared to make it after the prosecutor made his opening statement, but the judge refused to permit such conduct of the case.
 
 
 32
 Adams overstated the "sudden reversal" by Williams. Adams' attorney said,
 
 
 33
 Based upon Mr. Williams' attorney's representations to me, I believe[d] that he would be an excellent witness on behalf of my client.... On Monday, I was advised by Mr. Martin [U.S. Attorney] that he would in fact be testifying on behalf of the Government and that he had, based upon what he said, it was a striking difference between what I was told that he had advised his attorney.
 
 
 34
 It seems strange that an attorney would plan to use a witness without interviewing him personally first. Adams' attorney also complained that she was not able to interview Harold, who was in prison in Fredericksburg, Virginia. The district court expressed the view that it was not unreasonable to expect Adams' attorney to drive to Fredericksburg (about one hour away) to interview Harold.
 
 
 35
 On January 23, at motions argument, the U.S. Attorney said Harold was in custody, and Judge Richard Williams, who was then presiding, told Adams' counsel to ask Harold's probation officer how to locate Harold. The U.S. Attorney later called and told Adams' counsel that Harold was in fact incarcerated. Ultimately, the judge told Adams' counsel she could interview Harold at the courthouse the morning of the trial. She, however, apparently did not attempt to interview him before trial or during the one-hour lunch recess.
 
 
 36
 Adams' counsel also complains that she was given most of the discovery material too late to prepare adequately for trial. However, the case was not a very complicated one and in addition statements by Adams' counsel cut strongly against her:
 
 
 37
 [F]or example, on Friday, the 30th, I received about 50 documents to read. I spent all day in counsel's office, in Mr. Martin's office, from 10:30 to 3:30.
 
 
 38
 It appears that all materials were provided by the government in appropriate time; indeed, the government has noted that while Jencks Act material need not normally be produced until after the witness has testified, here the district judge had ordered pretrial production of witness statements and the government had complied without objection.
 
 
 39
 Adams' counsel knew what the trial schedule was from the beginning. Consequently, there were no unfair surprises. The district judge exercised his discretion in denying the motion for a new trial, and should not be reversed unless he abused his discretion. United States v. Gibson, 559 F.2d 934, 935 (4th Cir.1977) (per curiam) ("we see no error of law or abuse of discretion"), cert. denied, 434 U.S. 987 (1977); United States v. Wechsler, 406 F.2d 1032, 1033 (4th Cir.1969) (per curiam) ("The granting of a new trial is within the sound discretion of the trial judge who has a far greater familiarity with the entire record than we have."). There simply was no abuse of discretion.
 
 
 40
 V. Was exculpatory evidence improperly withheld by the government?
 
 
 41
 Adams has argued that the government improperly withheld Brady material because the sign-in log for the vault for September 10, the day of the last major theft, was not produced. The district judge ordered the government to produce the sign-in log at defense counsel's request, saying
 
 
 42
 I will order that if GSA has a sign-in sheet, that they make it available to you or the Government make it available to you. Because here again, this could be Brady material, because if you can show that there are a hundred different people that have free access to this vault, you can argue to a Jury that that would create a reasonable doubt as to whether your client purloined it or somebody else did.... my order will be comprehensive. If the GSA has it and the District Attorney doesn't have it, I'm ordering him to get for you whatever sign-in sheet they have or whatever you call it for the relevant period of time.
 
 
 43
 In response the government has averred that there was no Brady violation, and that the sign-in log and the vault's key log were both filed as exhibits on January 28, 1987: "The government thus provided the defendant access to all sign-in records which the government knows exists."
 
 
 44
 Even if a portion of the log was missing, we do not conclude that Adams has been denied a fair trial. His attorney was able to establish at trial that others besides Adams had access to the vault, both in general and on the particular day in question (September 10). The testimony of Williams and Harold that Adams was a participant in the conspiracy would not have been rebutted or even undermined by anything that could have been contained in the vault log.
 
 
 45
 In short the items complained of, singly or in combination, do not suffice to mandate reversal of the conviction or remand for a new trial.
 
 
 46
 AFFIRMED.
 
 
 
 [1]
 Adams was also indicted in January for theft as an additional charge related to the case, with motions due January 22 and argument on January 23, the same day as the arguments for motions related to the conspiracy charge. The trial at issue on appeal concerned only the conspiracy charge