927 F.2d 597
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff--Appellee,
v.
Roy Lee OWENS, Defendant--Appellant.
 No. 90-5335.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 6, 1990.
Decided Feb. 28, 1991.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Rockingham. Richard C. Erwin, Chief District Judge. (CR-89-237-R)
 James B. Craven, III, Durham, N.C., argued for appellant.
 Richard S. Glaser, Jr., Assistant United States Attorney, Greensboro, N.C., argued for appellee; Robert H. Edmunds, Jr., United States Attorney, Greensboro, N.C., on brief.
 M.D.N.C.
 AFFIRMED.
 Before WIDENER and CHAPMAN, Circuit Judges, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 This is an appeal from the conviction of Roy Lee Owens for conspiracy to possess with the intent to distribute five kilograms of cocaine, in violation of 29 U.S.C.A. Secs. 846 and 841(b)(1)(A). Owens asserts (1) that there was insufficient evidence to sustain a verdict of guilt and (2) that the trial judge erred in allowing evidence of his prior drug dealing to be admitted in violation of Federal Rule of Evidence 404(b).
 
 I.
 
 2
 The government sought to establish Owens' guilt through the testimony of law enforcement agents and co-conspirators who became government witnesses. The first witness to testify on behalf of the government was Special Agent W.R. Myers of the North Carolina State Bureau of Investigation. Myers testified that on the evening of September 20, 1989, he visited the residence of a person he suspected to be a drug dealer. That person was not at home, but Myers spoke to the suspect's brother, Ephraim Stancil. Ephraim and Myers discussed a drug deal whereby Myers agreed to sell Ephraim five kilograms of cocaine for $85,000. The two agreed that the delivery and exchange would take place the following week in Moore County. Ephraim gave Myers a business card with his home and work numbers listed on the back. Myers was to call Ephraim the following Monday, September 25, 1989.
 
 
 3
 On September 25, 1989, Myers called Ephraim and agreed to drive to the Pinehurst area of Moore County. Upon arrival, Myers phoned Ephraim and arranged to meet him on Highway 211 at 4:30 p.m. Because Ephraim was not allowed to drive, Myers agreed that Ephraim could bring a driver.
 
 
 4
 Myers waited at the designated spot until 5:00 p.m., then drove to a nearby Texaco station where he called Ephraim. Ephraim explained that he was waiting for the money to arrive from the "Graham area," and that he had sent someone to meet Myers. While Myers was on the phone, a car driven by Sandy Stancil pulled up. Ephraim described Sandy to Myers and told Myers to tell Sandy to return to Ephraim's house. Ephraim then told Myers to return to the prearranged meeting spot to wait for him.
 
 
 5
 After consulting with surveillance officers, Myers called Ephraim back and told him to meet him at the Texaco station. Approximately forty-five minutes later, Myers again called Ephraim, but did not speak with him. Shortly thereafter, Ephraim and Sandy drove into the Texaco station and directed Myers to follow them.
 
 
 6
 Ephraim and Sandy led Myers down a dirt road. Ephraim then got out of his car and into the car with Myers, and both cars continued to move at a slow pace down the road. Ephraim told Myers to flash his lights to stop Sandy to get the money. At about that time, the follow-up surveillance team appeared. Sandy sped off, and Myers identified himself and arrested Ephraim. The other officers apprehended Sandy.
 
 
 7
 Myers then went to the arrest point for Sandy where he was given a blue plastic bag from Sandy's car by the arresting officer. The bag contained two other bags, both of which contained United States currency. The total amount of money seized was approximately $80,000.
 
 
 8
 Ephraim turned state's witness and testified for the government as follows. On September 20, 1989, Ephraim was in Lumberton, North Carolina to make a drug deal. The drug deal was unsuccessful, but while there he met Myers and discussed buying five kilograms of cocaine from Myers for $85,000. Ephraim told Myers he needed to contact a friend about money for the deal. Ephraim did not tell Myers from whom he intended to get the money. Ephraim then gave Myers a business card with two numbers listed on the back, and they agreed to communicate on Monday, September 25, 1989.
 
 
 9
 On September 21, 1989, Ephraim contacted Owens to see about getting money for the deal. On September 24, 1989, Ephraim again spoke to Owens concerning the "money situation and the cocaine ... for the purchase on Monday."
 
 
 10
 On September 25, 1989, when Myers called Ephraim, Ephraim asked for more time to come up with the money. Ephraim then called Owens' body shop in Hendersonville to ask about the money. Owens told Ephraim that he was delayed due to trouble with an ignition switch on a truck he had sold to a customer, but told Ephraim he had the money. At 2:30 p.m., Owens called Ephraim, and told him that he was in Burlington, North Carolina, but had been able to raise only $60,000--$63,000. Ephraim told Owens that he would "round up" the rest of the money. Ephraim then contacted Melvin Cole, who agreed to put in the rest of the money.
 
 
 11
 At a little before 5:00 p.m., Ephraim sent Sandy to tell Myers to wait because the deal was still "on." Owens, accompanied by Andrew Richmond and an individual known as "Clem," came to Ephraim's house and Owens laid a blue bag containing money on the counter. Ephraim asked Owens to come with him to make the buy, but Owens declined. Ephraim then gave Owens a "piece" of cocaine and told him to wait.
 
 
 12
 Ephraim went to Cole's house to pick up the additional money. Ephraim testified that he then had two bags of money. The bag from Owens had a hole in it, and some of the money had fallen out. Ephraim tied a knot in Owens' bag, and put the money that had fallen out into the other bag. Ephraim, driven by Sandy, then went to meet Myers at the Texaco station. Because the Texaco station was too crowded, Ephraim had Myers follow him to a back road. Ephraim got out of his car and into the car with Myers. As the two were discussing a shortage in the money, police officers showed up and Sandy fled in his car. Myers then arrested Ephraim. After his arrest, Ephraim gave a statement to another agent, Kowalski, describing Owens and Richmond and explaining where they could be found.
 
 
 13
 The next person to testify was Tim Monroe, Detective Sergeant in charge of narcotics for the Monroe County Sheriff's Department. Monroe was a surveillance officer on September 25, 1989. Monroe apprehended Sandy as he fled by automobile. Monroe testified that on the passenger side of the car driven by Sandy, he found a partially opened blue bag which contained bundles of United States currency. Monroe did not meet Owens until several officers went to Ephraim's garage. Monroe testified that the total amount of money seized during the entire operation was $80,970: $45,980 from one bag, $31,960 from the second bag, and $2,847 from Richmond's pants pocket.
 
 
 14
 The next government witness was Richmond. Richmond, who admitted to being a drug dealer, testified as follows. On September 24, 1989, Richmond received a phone call from Owens about "getting his money up" to purchase cocaine. Owens and Richmond arranged to meet at 3:00 p.m. at the Whopper House in Burlington, North Carolina on the following day, September 25, 1989. Richmond got his money together and met Owens as arranged. Richmond testified that Owens had $10,000 "on him." Richmond and Owens put their money in a blue bag. He, Owens, and Clem then went to Ephraim's house. At the house, Richmond handed the money bag to Owens, who took it and laid it on the table. Ephraim then gave Owens a small sample of cocaine, and told the men to wait in the body shop adjacent to the house. As the men were waiting in the "paint booth" the police arrived and arrested them. Richmond testified that he was supposed to have gotten two kilos of cocaine and Owens was to get "half a ki" and be fronted another half a "ki," with the rest of the cocaine going to Ephraim.
 
 
 15
 The final government witness was Wayne W. Kowalski, Special Agent with the Federal Drug Enforcement Administration, United States Department of Justice. Kowalski was part of the surveillance team on September 25, 1989. Kowalski spoke to Ephraim immediately following his arrest. Ephraim told Kowalski that there were two gentlemen at the body shop who had put up a substantial amount of the money, and described the men and named them as "Roy Owens" and "Andrew" (Richmond). Kowalski then went with other officers to Ephraim's garage where Owens and Richmond were arrested.
 
 
 16
 At the close of the government's case, Owens made a motion for a directed verdict based on the insufficiency of the evidence. This motion was denied. Owens then presented his defense, which consisted of the testimony of his wife. At the close of all the evidence, Owens renewed his motion for a directed verdict, which was denied.
 
 II.
 
 17
 Owens first challenges the sufficiency of the evidence to support the jury's verdict of guilt. In reviewing a sufficiency of the evidence question, the relevant question is whether, after reviewing the evidence, both direct and circumstantial, in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979).
 
 
 18
 In establishing the essential elements of a crime of conspiracy, the government must prove that a conspiracy existed, that the defendant knew of the conspiracy's purpose, and that some action occurred indicating the defendant's voluntary participation in the conspiracy. United States v. Dominquez, 604 F.2d 304, 310 (4th Cir.1979), cert. denied, 444 U.S. 1014 (1980). In reviewing these elements as applied to this case, this means that the "jury must have been warranted in finding beyond a reasonable doubt that a conspiracy existed, that [Owens] knew of it, and that he voluntarily became a part of it." Id. at 310.
 
 
 19
 The existence of a conspiracy need not be proved by direct evidence. It may be established by circumstantial evidence such as the defendant's relationship with other members of the conspiracy, the length of his association, his attitude, conduct, and the nature of the conspiracy. United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir.1984), cert. denied, 469 U.S. 1105 (1985). Once a conspiracy is shown, only slight evidence is needed to link a defendant to it. United States v. Laughman, 618 F.2d 1067, 1076 (4th Cir.), cert. denied, 447 U.S. 925 (1980).
 
 
 20
 As indicated by the synopsis of testimony set forth above, there was a wealth of information in this case from which a jury could conclude, beyond a reasonable doubt, that Owens was a participant in this conspiracy. Ephraim's testimony clearly linked Owens to the plan, as did the testimony of Richmond. Although both of these witnesses were co-conspirators who were extended leniency by the government in exchange for their testimony, that fact went to the issue of their credibility in the eyes of the jury. Our focus is on the sufficiency, not the credibility, of the evidence. We have reviewed the transcript and conclude that ample evidence exists to support Owens' conviction.
 
 III.
 
 21
 Owens next challenges the trial court's admission of evidence concerning previous drug dealing between Owens and Richmond. Prior to trial, the government filed notice, pursuant to Federal Rule of Evidence 404(b), of its intent to use evidence of a conversation which had occurred between Owens and undercover officer Phil Sweat on September 18, 1989 regarding the purchase of five kilograms of cocaine. Ephraim was also present during this transaction. The Court denied this motion and ruled that evidence of this conversation would not be admissible.
 
 
 22
 On direct examination of government witness Richmond, the following colloquy occurred regarding Richmond's association with Owens:
 
 
 23
 Q: Do you know Roy Lee Owens?
 
 A: Yes
 
 24
 Q: How long have know [sic] Roy Lee Owens?
 
 A: Since around August
 
 25
 Q: Of what year?
 
 A: '89
 
 26
 Q: How do you know Roy Owens?
 
 A: Through drug transactions
 
 27
 On redirect examination of Richmond, the following colloquy also occurred:
 
 
 28
 Q: Mr. Richmond, you indicated on cross examination that you got all this money on drug deals over the past month, is that correct?
 
 
 29
 A: Yeah.
 
 
 30
 Q: And without getting specific, were any of those drug deals with the Defendant Roy Owens?
 
 A: Yes
 
 31
 Q: Did he have that truck because it broke down during an attempt by you to do a drug transaction then?
 
 
 32
 DEFENSE COUNSEL: Objection to the leading, Your Honor.
 
 
 33
 THE COURT: Sustained. This is a little outside the scope, but what is your answer? What did you say?
 
 THE WITNESS: Yes
 
 34
 At the close of the government's case, counsel for Owens requested the trial court to instruct the jury to disregard any evidence of prior criminal acts of the defendant.
 
 
 35
 The trial court then pointed out to counsel for Owens that, to some degree, he had opened the door for some of the material by virtue of his cross-examination. More importantly, the trial court pointed out that the objectionable evidence was brought out on direct examination, without objection from the defendant, and without any motion to strike. The trial court then denied the request in its entirety. On appeal, Owens argues error in the trial court's admission of this evidence and subsequent refusal to issue a curative instruction.
 
 
 36
 No objection was entered when the evidence of Richmond's past association with Owens was elicited, or at a previous point when prior drug dealing on the part of Owens was mentioned in other testimony. Prior to the testimony of Richmond, to which Owens entered his tardy objection, similar evidence came in through Ephraim. On cross-examination, defense counsel asked Ephraim if he knew that "Roy Owens was a small time cocaine user and addict" to which Ephraim responded affirmatively. Later on redirect examination, the government asked Ephraim, "You were also asked on cross-examination if you knew Roy Owens to be a cocaine user and addict. Did you also know Roy Owens to be a drug dealer?" Ephraim also answered this question affirmatively. No objection was entered at this point.
 
 
 37
 Appellant argues that it was not necessary for him to make an objection to Richmond's testimony because he had previously obtained a favorable ruling on the 404(b) motion. As noted above, the 404(b) ruling pertained to a different matter, specifically, the unsuccessful September 18, 1989 drug deal. However, even assuming that it did not, this still would not relieve Owens of his responsibility to enter a contemporaneous objection.
 
 
 38
 The general rule is that an objection must be made at the time the objectionable evidence is offered. United States v. Parodi, 703 F.2d 768 (4th Cir.1983); DiPaola v. Riddle, 581 F.2d 1111 (4th Cir.1978). Additionally, an objection not properly entered is waived for purposes of an appeal unless there is plain error. United States v. Vogt, 910 F.2d 1184 (4th Cir.1990). Inasmuch as this Court concludes that no objection was entered, and there is no plain error present in this case, it declines to reverse Owens' conviction.
 
 
 39
 Accordingly, for the reasons discussed above, Owens' conviction is
 
 
 40
 AFFIRMED.