PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

SEAN CHRISTOPHER OSBORNE,
  *Defendant-Appellant.*

No. 06-4987

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, Chief District Judge.
(1:06-cr-00025-JPJ)

Argued: October 31, 2007

Decided: January 29, 2008

Before MICHAEL, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Michael and Judge Duncan joined.

## COUNSEL

**ARGUED:** Jay H. Steele, Lebanon, Virginia, for Appellant. Zachary T. Lee, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

**OPINION**

KING, Circuit Judge:

Sean Christopher Osborne appeals from his conviction for conspiring to commit the November 3, 2005 armed robbery of a Walgreens pharmacy in Bristol, Virginia, and from his sentence on the conspiracy offense and two other crimes. He contends that the district court erred in denying his motion for judgment of acquittal on the conspiracy offense, in that there was insufficient evidence on which to find that he entered into an agreement with his indicted coconspirator, Brian David McCrae, to rob the pharmacy. Additionally, Osborne asserts that the court erred in calculating his Sentencing Guidelines range — first, by enhancing his offense level for abducting two pharmacy employees to facilitate the commission of the robbery and his unimpeded escape from the scene, and, second, in assigning him a criminal history point for a prior shoplifting sentence. As explained below, we affirm.

I.

A.

On April 4, 2006, a grand jury in the Western District of Virginia indicted Osborne and McCrae on three counts: (1) conspiracy to rob a pharmacy, in contravention of 18 U.S.C. § 2118(d) (the "conspiracy offense"); (2) armed robbery of a pharmacy, in violation of 18 U.S.C. § 2118(a) and (c)(1) (the "robbery offense"); and (3) possession with intent to distribute OxyContin, in contravention of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (the "drug offense").[1] On June 21, 2006,

---

[1]The conspiracy and robbery offenses were charged under § 2118 of Title 18, also known as the Controlled Substance Registrant Protection Act of 1984. Subsection (d) of that statute makes it a crime to conspire with another person to violate subsection (a). *See* 18 U.S.C. § 2118(d) (delineating offense where "two or more persons conspire to violate subsection (a) . . . of this section and one or more of such persons do any overt act to effect the object of the conspiracy"). Subsection (a), in turn, makes it a crime to

Osborne pleaded guilty to the robbery and drug offenses. That same day, a two-day jury trial began for Osborne (on the conspiracy offense only) and McCrae (on all three offenses).

1.

a.

The evidence adduced by the Government at trial established that, at the time of the November 3, 2005 robbery, Osborne and McCrae resided together in Washington County, Virginia, with Osborne's girl-friend, Michelle Sisto; Osborne's fourteen-year-old son, whom we refer to as "Sean Jr."; and Osborne and Sisto's two younger children. Osborne and McCrae had histories of drug and alcohol abuse, and

---

take[ ] or attempt[ ] to take from the person or presence of another by force or violence or by intimidation any material or compound containing any quantity of a controlled substance belonging to or in the care, custody, control, or possession of a person registered with the Drug Enforcement Administration [where] (1) the replacement cost of the material or compound to the registrant was not less than $500, (2) the person who engaged in such taking or attempted such taking traveled in interstate or foreign commerce or used any facility in interstate or foreign commerce to facilitate such taking or attempt, or (3) another per-son was killed or suffered significant bodily injury as a result of such taking or attempt.

*Id.* § 2118(a). Subsection (c)(1) provides enhanced penalties for "[w]hoever in committing any offense under subsection (a) . . . assaults any person, or puts in jeopardy the life of any person, by the use of a dangerous weapon or device." *Id.* § 2118(c)(1).

The drug offense — which involved OxyContin, a brand name for a drug containing the Schedule II controlled substance oxycodone, *see United States v. Alerre*, 430 F.3d 681, 684 n.2 (4th Cir. 2005) — was charged under § 841 of Title 21. Subsection (a)(1) of that statute crimi-nalizes, inter alia, possession with intent to distribute a controlled sub-stance. *See* 21 U.S.C. § 841(a)(1). Subsection (b)(1)(C) provides the penalties for an offense involving a Schedule II controlled substance. *See id.* § 841(b)(1)(C).

there are indications that Osborne (and perhaps McCrae) was under the influence of such substances on November 3, 2005. That evening, between 7:00 and 7:30 p.m., Osborne, McCrae, and Sean Jr. left their home in Osborne's minivan and drove to the nearby Blountville, Tennessee residence of Osborne's brother, Jay. Sean Jr. testified that, after their arrival, Osborne and McCrae spoke with Jay in his garage, while Sean Jr. remained in the van. A short time later, Osborne and McCrae returned to the vehicle. Osborne then drove the van back to Virginia, with McCrae in the front passenger seat and Sean Jr. in the seat behind that of his father. Their return trip took place, in part, northbound on Interstate 81.

Although their home was located on Lee Highway immediately off Virginia's Exit 10 of Interstate 81, Osborne took Exit 3 (seven miles short of Exit 10, and just north of the state line) into Bristol, Virginia. When the van came to a halt at a stop sign at Lee Highway and Euclid Avenue, Sean Jr. observed Osborne pulling up the hood of his sweatshirt around his face and tying it tightly to secure it there. Sean Jr. also overheard McCrae "saying something about jumping the counter," and Osborne responding "'Okay, okay.'" J.A. 21.[2] Sean Jr. did not hear anything else said between Osborne and McCrae during the drive. Sean Jr. was listening to rock music through headphones, and the radio of the van was playing different rock music so loud that Sean Jr. could hear it over his own music.

According to Sean Jr., Osborne drove the van to the Walgreens pharmacy, which was located at the intersection of Lee Highway and Valley Drive. Rather than parking the van in the Walgreens parking lot, Osborne parked it on a nearby street, obscuring it behind a group of trees next to the Walgreens property. After Osborne and McCrae exited the vehicle, McCrae walked away from the van toward the Walgreens building and out of Sean Jr.'s sight. Meanwhile, Osborne again tightened the hood of his sweatshirt around his face. Sean Jr. asked Osborne "what he was doing, and [Osborne] said, 'Something I ain't done before.'" J.A. 24. Sean Jr. then asked Osborne "if he was going to rob the store, and [Osborne responded], 'Yeah.'" *Id.* Osborne drew the hood of his sweatshirt even tighter, put on a pair of sun-

---

[2]Our citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

glasses, and started walking toward the Walgreens building. Sean Jr. immediately left on foot for a friend's house, because he "didn't want to be there when it was happening." *Id.* at 25-26.

b.

The Walgreens building was divided into a store area and a pharmacy section. Customers entered the Walgreens building into the store area. A photo counter and a cash register were located at the front of the store area, beyond which was a series of aisles containing products for sale such as cosmetics and over-the-counter medications. Beyond these aisles (at the back of the premises), customers would finally reach the pharmacy section. Customers were assisted by pharmacy employees at a counter separating the store area from the pharmacy section. Pharmacy employees entered the pharmacy section through a secured door (unlocked via keypad) intended to keep out unauthorized persons, and could view customers approaching the pharmacy counter through a glass window.

Osborne entered the Walgreens building, robbed the pharmacy, and then left the premises, all between 9:30 and 10:00 p.m. Keri Sword, a pharmacist registered by the Drug Enforcement Administration to distribute controlled substances, and Amanda Mabe, a pharmacy technician, were working in the pharmacy section; other employees were present in the store area. While Sword and Mabe were assisting pharmacy customers and preparing to close for the night, Mabe noticed Osborne (still wearing his hood and sunglasses) speaking with an assistant store manager in the store area near the pharmacy section. The assistant manager was showing Osborne some latex gloves that were for sale. Some minutes later, Osborne approached the pharmacy counter and told Mabe that he had a question for the pharmacist. Mabe informed Sword that Osborne had a question for her, and Sword went to the counter to speak to Osborne. Osborne stated that he had a severe earache, and he asked Sword to show him an over-the-counter medication that he could take for it. Sword then left the pharmacy section through the secured door, intending to show Osborne where the ear medications were located in the store area.

Osborne stopped Sword just outside the secured door, telling her that he needed OxyContin for his grandmother who could not afford

that medication after losing her insurance. Osborne then moved his hands inside the front pouch pocket of his sweatshirt, pulling his right hand back just far enough to show Sword that he had a knife. Sword could see the brown handle of the knife, as well as a portion of its silver blade, which she estimated was two to three inches thick at the base. In Sword's words, she was "[a]bsolutely terrified" when she saw the knife. J.A. 58. Thereafter, Sword advised Osborne that she "would get whatever he wanted from the pharmacy," and Osborne indicated that he wanted 20-milligram tablets of OxyContin, as well as Valium tablets. *Id.* at 59. Sword then turned to re-enter the pharmacy section to get the specified drugs for Osborne, and Osborne followed her through the secured door. As Sword walked through the pharmacy section to the narcotics safe, Osborne admonished her not to set off any alarms and she assured him that there were none. Sword then opened the narcotics safe with her keys, removed the three bottles (two full and one partially depleted) of OxyContin 20-milligram tablets stored therein, confirmed with Osborne that the generic equivalent of Valium was acceptable to him, and then removed the Valium-equivalent tablets from the safe.

At that point, Osborne was speaking to Mabe, who testified that she knew as soon as Osborne entered the restricted pharmacy section with Sword "that something was going on." J.A. 79. Once she heard Osborne warning Sword not to set off any alarms, Mabe had placed her hands on the counter and stared straight ahead (as she had been trained to do by Walgreens). While Sword was removing drugs from the narcotics safe, Osborne walked over to Mabe and talked to her about committing the robbery for his grandmother, asserting "that he hated to do this" and that "he wasn't a violent person." *Id.* at 80. Sword then handed Osborne the drugs that he had demanded — numbering 224 OxyContin 20-milligram tablets and 407 Valium-equivalent tablets — which had a total replacement value of $629.

According to Sword, Osborne then stated to Mabe and her "that we were never going to get a good picture of him because of his sun glasses, and the way the hood was pulled up on his sweat shirt, and also that there would be no fingerprints because he had gloves on his hands [i.e., latex gloves taken from the store area], and that we weren't going to be able to catch him." J.A. 60. After making these assertions and receiving no response from Sword and Mabe, Osborne

looked directly at Sword and instructed her to "'[w]alk me out.'" *Id.* Sword complied with Osborne's directive, walking toward the secured door of the pharmacy section with him "[b]ecause he had a knife and he told me to. And I was too scared not to do what he asked." *Id.* At first, Mabe remained in the pharmacy section with her hands on the counter. When Osborne and Sword reached the secured door, however, Osborne directed Sword to tell Mabe to come with them; both Sword and Mabe complied.[3]

Sword described the subsequent walk from the pharmacy section through the store area as follows:

> [Osborne] was walking behind us, and [Mabe and I] were side by side in front of him. And we started to exit, and go straight down the aisle toward the front of the store toward our photo counter. We got to about the middle of the store where the aisleway split, and [Osborne] told us to turn, and not to go straight. So, we turned through the middle of the store to walk across the store. We got to the end, and we turned left to walk toward the front door. We got to our cosmetics area, and [Mabe] and I stopped. We were close to the door, and . . . there were some customers at the front register, and my assistant manager walked by us, and [Osborne] started to come up around us to get a little ahead of us, and he told us to walk outside with [him]. And we did advance a little further toward the front door, and I believe he told us again to come outside, and I told him no, that this was far enough, and he did walk on outside the front door, and he stopped and turned and looked at us, and he motioned for us to come outside, and I just shook my head no, and finally he turned and walked away.

---

[3]Like Sword, Mabe complied with Osborne's instructions "[b]ecause he had a weapon." J.A. 81. Although Mabe did not see a weapon, she assumed Osborne possessed one because he had his hands in his sweatshirt pocket, and because she knew that Sword would not have allowed Osborne in the pharmacy section if she and Mabe had not been in danger.

J.A. 61-62. Thereafter, Sword closed the front door of the Walgreens building and locked it.[4]

c.

Osborne arrived home — with McCrae (whose whereabouts during the robbery are unknown) — shortly after 10 p.m. At the time, Sisto was in the living room sitting on the couch, and her and Osborne's two young children were sleeping in a bedroom. According to Sisto, McCrae "came in the door first, and kind of shook his head at me." J.A. 88. McCrae's conduct prompted Sisto to ask, "'What?,'" to which McCrae answered, "'Nothing.'" *Id.* Undeterred, Sisto said, "'No, please tell me what.'" *Id.* All McCrae said in response was, "'It's not good, and I'm not telling you anything else.'" *Id.* McCrae then went into the kitchen.

Thereafter, Osborne entered the house, and Sisto followed him into the dining room, peppering him with questions about where he and McCrae had been for the past three hours, and where they had left Sean Jr. After Osborne claimed that he could not recall what happened to Sean Jr., McCrae was pulled into the conversation in the dining room, and claimed that he and Osborne had driven Sean Jr. to a friend's house. Sisto and McCrae then returned to the living room, and Osborne went into the kitchen, where Sisto saw him handling beer mugs in which he had routinely hidden drugs and other things from the children.

---

[4]Notably, Sword testified that, at Osborne's direction, she had passed through the front door, taking at least one step outside of the Walgreens building. *See* J.A. 68 (explaining that she stepped through the door because Osborne gestured her out, and that she "did not return back through the door until [Osborne] turned to walk away"). The record reflects that Sword's testimony was corroborated at trial by surveillance camera footage. The testimony of Mabe, however, lacked any reference to Sword stepping through the door to the outside of the Walgreens building. *See id.* at 81 (stating that when Osborne went outside, she and Sword stopped at the door, and then Osborne "asked us to come outside a couple of times. And [Sword said] no, and finally she [said], 'No, this is far enough,' and she lock[ed] the door and shut[ ] it").

Sisto subsequently spotted Osborne making a call on his cell phone and, still concerned about what had transpired that night, followed him through the house in an effort to "gauge from his conversation where he had been." J.A. 89. Sisto overheard Osborne telling the person at the other end of the line "that it was in their best interests to come to the house . . . and that he needed a point, which to me meant needle." *Id.* Sisto took the phone from Osborne and threw it against a wall. She asked Osborne again "where he had been and what he had done, that if police officers were going to be showing up at the door and our children were there asleep I needed to know what he had done." *Id.* Osborne told Sisto, "'Don't worry about it; Christmas is taken care of,' and that whatever he had done was illegal." *Id.* Furious, Sisto announced that she was leaving, packed clothes, and awakened her daughter. As Sisto passed through the kitchen, Osborne pushed her into some shelves, and Sisto pushed him back. Sisto then overturned the beer mugs, spilling out pill bottles (identified by other witnesses as those stolen from the Walgreens pharmacy) onto the floor. She asked Osborne, "'What are these?'" Osborne grabbed Sisto by the neck, carried her into the dining room, and threw her on a table. Sisto fled the house with her daughter, drove some three miles to a Wal-Mart store, and realized upon her arrival there that her son remained at the house with Osborne. Sisto called the police from her car, and officers met her in the Wal-Mart parking lot.[5]

d.

Officers from both Bristol's police department and Washington County's sheriff's department went to the Osborne/McCrae/Sisto residence to follow up on Sisto's allegations of domestic assault, as well as to investigate Osborne and McCrae in connection with the Walgreens robbery. Osborne answered the door and was immediately arrested for domestic assault. Officers then saw McCrae disappearing into the bedroom area of the house, and ordered him to the entryway. One officer spotted a bulge in the left pocket of McCrae's pants, and performed a pat-down search of McCrae for weapons. Upon patting

---

[5]According to Sisto, she did not see McCrae in the house between the time she overheard Osborne's cell phone conversation and the time she fled in her car. She believed that McCrae had left the premises, although she had not seen him do so.

the bulge in McCrae's pants pocket, the officer identified it as a bag of pills, rather than as a weapon. The bag was removed from McCrae's pocket, and the ninety-nine pills contained therein were determined to be OxyContin 20-milligram tablets. A second bag of pills (containing twenty-one OxyContin 20-milligram tablets) was subsequently recovered from the pocket of a shirt found in the dining room. McCrae acknowledged to officers that the shirt belonged to him. Other items recovered from the house included latex gloves, three knives, and pill bottles for OxyContin 20-milligram tablets identical to those stolen from the Walgreens pharmacy.

2.

At the close of the Government's case-in-chief during the first day of trial, Osborne made a motion, pursuant to Federal Rule of Criminal Procedure 29, for judgment of acquittal on the conspiracy offense. *See* Fed. R. Crim. P. 29(a) (providing that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction"). In support of his Rule 29 motion, Osborne asserted that "[t]he Government has produced no evidence that there was an agreement between these two parties [Osborne and McCrae] to commit that crime." J.A. 145. The district court denied Osborne's motion from the bench.

The following morning, June 22, 2006, the jury was advised that neither Osborne nor McCrae would be presenting further evidence. Later that day, the jury returned a guilty verdict on all of the charges before it — that is, against Osborne on the conspiracy offense, and against McCrae on the conspiracy, robbery, and drug offenses. Osborne subsequently renewed his Rule 29 motion, which, on August 24, 2006, was again denied by the district court. *See* Fed. R. Crim. P. 29(c)(1)-(2) (authorizing defendant to renew his motion for judgment of acquittal following return of guilty verdict, and court to set aside verdict and enter acquittal).[6]

---

[6]McCrae also unsuccessfully sought judgment of acquittal with respect to the charges against him, moving for such relief both during and after the trial, on the same basis asserted by Osborne, as well as on additional grounds.

## B.

Following the trial, Osborne's presentence investigation report (the "PSR") was prepared, calculating an advisory sentencing range under the 2005 edition of the Sentencing Guidelines. The PSR grouped the conspiracy offense with the robbery and drug offenses to which Osborne had pleaded guilty, and calculated a total offense level of 27 and a criminal history category of III. An addendum to the PSR notes the Government's objection to the PSR's failure to apply a four-level enhancement to Osborne's offense level for the abduction of Walgreens employees Sword and Mabe during the robbery. *See* USSG § 2B3.1(b)(4).

The district court conducted a sentencing hearing for Osborne, as well as McCrae, on September 18, 2006. During the hearing, the court ruled (over Osborne's objection) that the abduction enhancement was applicable to the calculation of Osborne's total offense level. The court ultimately assigned him an offense level of 30.[7] The court also adopted the PSR's calculation of a criminal history category of III, based on an assessment of four criminal history points, including one point (to which Osborne also objected) for a prior shoplifting sentence. The offense level of 30 and the criminal history category of III resulted in a Sentencing Guidelines range of 121 to 151 months. The court then sentenced Osborne at the high end of the advisory Guidelines range, to 151 months of imprisonment. Osborne timely noted this appeal, in which he challenges his conviction on the conspiracy offense and his within-Guidelines sentence.[8]

---

[7]The court reached the offense level of 30 by adopting the following recommendations of the PSR (in addition to imposing the four-level abduction enhancement): a base offense level of 20, *see* USSG § 2B3.1(a); a one-level enhancement for stealing controlled substances, *see id.* § 2B3.1(b)(6); and a two-level enhancement for obstruction of justice, *see id.* § 3C1.1. The court rejected, however, the PSR's recommendation for a four-level enhancement for "using" a dangerous weapon during the robbery, *see id.* § 2B3.1(b)(2)(D), opting instead (at Osborne's insistence) for a three-level enhancement for "brandishing" the weapon, *see id.* § 2B3.1(b)(2)(E).

[8]McCrae also filed an appeal, in which he unsuccessfully challenged the district court's denial of his motion to suppress evidence of the pills

II.

A.

With respect to his conviction on the conspiracy offense, Osborne maintains that the district court erred in refusing to enter a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. We review de novo a district court's denial of a motion for judgment of acquittal. *See United States v. Ryan-Webster*, 353 F.3d 353, 359 (4th Cir. 2003). We are obliged to sustain a guilty verdict that, viewing the evidence in the light most favorable to the prosecution, is supported by "'substantial evidence.'" *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). We have defined "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

Osborne contends on appeal — as he did in the district court — that there was insufficient evidence on which a reasonable jury could find that he and McCrae entered into an agreement to rob the Walgreens pharmacy. *See* 18 U.S.C. § 2118(d) (establishing crime where "two or more persons conspire" to rob pharmacy); *see also Iannelli v. United States*, 420 U.S. 770, 777 n.10 (recognizing "agreement [as being] the essential element of the crime" of conspiracy). In rejecting Osborne's motion for judgment of acquittal, the district court observed that a reasonable jury was entitled to find Osborne guilty of the conspiracy offense based on the following evidence: Osborne and McCrae were together immediately before and immediately after the robbery; shortly before the robbery, during the drive through Bristol toward the Walgreens pharmacy, Sean Jr. overheard McCrae "saying

---

found in his pants pocket during the pat-down search on the night of the robbery. *See United States v. McCrae*, No. 06-4988, 2007 WL 2122103 (4th Cir. July 25, 2007). McCrae did not otherwise contest his convictions or his 60-month sentence. Notably, the sentencing court did not apply the abduction enhancement to McCrae, because he was not present in the Walgreens building during the robbery and could not have reasonably foreseen that Osborne would abduct the pharmacy employees.

something about jumping the counter," and Osborne responding "'Okay, okay,'" J.A. 21; upon returning home just after the robbery, McCrae responded to Sisto's inquiries about where he and Osborne had been by stating, "'It's not good, and I'm not telling you anything else,'" *id.* at 88; and, later that night, police officers recovered ninety-nine stolen OxyContin 20-milligram tablets from the pocket of the pants McCrae was wearing, and another twenty-one such tablets from the pocket of a shirt in the dining room that McCrae admitted was his shirt. Additionally, the evidence reflected that Osborne made preparations for the robbery in McCrae's presence — including exiting Interstate 81 some seven miles short of home, disguising himself during the drive (just before McCrae made the "jumping the counter" comment) by tightening the hood of his sweatshirt around his face, and obscuring his van from view of the Walgreens pharmacy by parking it on a nearby street behind a group of trees. Notably, Osborne's preparations for the robbery were so recognizable as such that fourteen-year-old Sean Jr. deduced what his father was about to do. And, Osborne confirmed to his son that he was preparing to commit the robbery, thus negating any notion that the robbery was not planned prior to the time that Osborne entered the Walgreens building.

Viewed in the light most favorable to the Government, the foregoing evidence — including what reasonably can be construed as McCrae's advice to Osborne (in the course of his obvious preparations for the robbery) to "jump[ ] the counter" of the pharmacy — plainly permits the conclusion that Osborne and McCrae entered into an agreement to commit the robbery. Indeed, the evidence permits a finding that McCrae did not (like Sean Jr.) innocently find himself at the scene of an imminent crime. That is, the fact that Osborne and McCrae returned home together immediately after the robbery indicates that McCrae stood by knowing the robbery was underway and was prepared to flee with Osborne posthaste. McCrae's response to Sisto's inquiries about where he and Osborne had been — that "[i]t's not good" — can fairly be interpreted as a reference to the robbery. And, the fact that McCrae shared in the fruits of the robbery, i.e., the fact that he came into possession that night of 120 of the stolen OxyContin 20-milligram tablets, shows that McCrae was rewarded for taking a role in the robbery's commission.

Osborne urges us to deem this evidence insufficient to prove he conspired with McCrae to rob the Walgreens pharmacy, essentially

asserting that it is circumstantial, subject to alternative interpretations, and contradicted by other evidence suggesting that Osborne acted alone. For example, Osborne points out that the "jumping the counter" comment overheard by Sean Jr. was simply a "snippet of conversation" without any context, and that the comment may have been "an attempt to dissuade [Osborne from committing the robbery], McCrae thinking [Osborne] was blowing hot air, or something different altogether." Br. of Appellant 11. Osborne emphasizes the fact that McCrae was not seen inside the Walgreens building, and that, in Osborne's statements to the pharmacy employees and Sisto that night, he never referred to committing the robbery with McCrae or anyone else. Osborne also suggests that, rather than receiving the OxyContin 20-milligram tablets from him as the fruits of a prior agreement to rob the Walgreens pharmacy, McCrae just as likely stole the pills from him, bought them from him, or received them from him in exchange for a post-robbery promise to keep quiet about his conduct that night.

Unfortunately for Osborne, "a conspiracy may be proved wholly by circumstantial evidence," and "'may be inferred from a development and collocation of circumstances.'" *Burgos*, 94 F.3d at 858 (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)) (other citations and internal quotation marks omitted); *see also Iannelli*, 420 U.S. at 777 n.10 ("The agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case."). Moreover, as a general proposition, "circumstantial evidence . . . may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence." *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989). Properly considered in its totality, the evidence in this case — though circumstantial and susceptible to alternative interpretations — certainly was adequate and sufficient to support the jury's conclusion that Osborne and McCrae entered into an agreement to rob the Walgreens pharmacy. We therefore affirm Osborne's conviction on the conspiracy offense.

B.

As for his sentence, Osborne contends that the district court miscalculated his advisory Sentencing Guidelines range by, first, imposing the four-level abduction enhancement, and, second, assigning him a

single criminal history point for the prior shoplifting sentence. The Supreme Court has recently held that "courts of appeals must review all sentences — [including those] inside . . . the Guidelines range — under a deferential abuse-of-discretion standard." *See Gall v. United States*, 128 S. Ct. 586, 590 (2007). The first step in this review requires us to "ensure that the district court committed no significant procedural error, such as . . . improperly calculating . . . the Guidelines range." *Id.* at 597. In assessing whether a sentencing court properly applied the Guidelines, "we review the court's factual findings for clear error and its legal conclusions de novo." *United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006). "On mixed questions of law and fact regarding the Sentencing Guidelines, we apply a due deference standard in reviewing the district court." *United States v. Nale*, 101 F.3d 1000, 1003 (4th Cir. 1996).

1.

Osborne maintains that he was not subject to the abduction enhancement, because he did not, within the meaning of the Guidelines, "abduct" the pharmacy employees during the Walgreens robbery. Such a four-level enhancement is called for under the robbery guideline "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape." USSG § 2B3.1(b)(4)(A). The Guidelines generally define "abducted" as "mean[ing] that a victim was forced to accompany an offender to a different location." *Id.* § 1B1.1 cmt. n.1(A). And, the Guidelines offer as an example of an abduction "a bank robber's forcing a bank teller from the bank into a getaway car." *Id.* As our sister circuits have recognized, the abduction enhancement is intended, at least in part, to protect victims against the additional harm that may result from being forced to accompany an offender, such as being taken as a hostage during a robbery or being isolated to prolong a sexual assault. *See United States v. Whooten*, 279 F.3d 58, 61 (1st Cir. 2002); *United States v. Saknikent*, 30 F.3d 1012, 1013 (8th Cir. 1994).

Here, the district court concluded that Osborne abducted pharmacy employees Sword and Mabe within the meaning of the Guidelines, in that he "intentionally and forcibly moved [them] from their post in the pharmacy [section] at some distance across the [store area] to the front door," for the purpose of "facilitat[ing] [his] escape and his com-

mission of the robbery." J.A. 182.[9] Osborne admits on appeal that he forced Sword and Mabe to leave the pharmacy section and walk with him across the store area to the front door of the Walgreens building, thereby facilitating the robbery and his escape from the scene. He contends, however, that "[t]he mere movement of victims within the confines of the store are not what the [Guidelines] define[ ] as abduction," in that the victims were never "moved to a different location." Br. of Appellant 13-14. In other words, Osborne concedes that — "to facilitate commission of the offense or to facilitate escape," USSG § 2B3.1(b)(4)(A) — "a victim was forced to accompany an offender," *id.* § 1B1.1 cmt. n.1(A), but he disputes that the victim was forced to accompany the offender "*to a different location,*" *id.* (emphasis added).

There are two aspects to Osborne's "different location" contention: first, that movement within the confines of a single building can never constitute movement "to a different location"; and second, that even if some movement within the confines of a single building can constitute movement "to a different location," his particular movement of the pharmacy employees within the Walgreens building was not movement "to a different location." We address these two aspects of Osborne's contention in turn.[10]

---

[9]The district court observed — contrary to the testimony of Sword that she took at least one step outside of the Walgreens building at Osborne's direction, *see supra* note 4 — that neither Sword nor Mabe "actually [went] out the front door." J.A. 182. In making this observation, the court apparently relied on its recollection of the trial evidence, as well as Osborne's assertion at the sentencing hearing (which went unchallenged by the Government) that "[t]he evidence in this case is that neither [Sword nor Mabe] ever moved outside the confines of the store in which they were employed." *Id.* at 162. There is no indication that the court recalled Sword's testimony to the contrary or rejected it as unworthy of belief. Nevertheless, we accept for purposes of our review of the abduction enhancement that Sword remained inside the Walgreens building.

[10]As a threshold matter, we recognize that the single example of an abduction provided in the Guidelines — "a bank robber's forcing a bank teller from the bank into a getaway car," USSG § 1B1.1 cmt. n.1(A) — provides little guidance in our assessment of whether an abduction occurred here, in that it is a nonanalogous, nonexclusive example of an abduction with indisputable movement "to a different location."

a.

We have previously assessed the Guidelines definition of "abducted" in only one published decision, our 1996 decision in *United States v. Nale*. *See* 101 F.3d at 1003. We recognized in that case, as Osborne acknowledges here, that "even a temporary abduction" — i.e., one with minimal movement of the victim or that lasts only a short duration — "can constitute an abduction for purposes of the sentencing guidelines." *Id.* We were not called upon in *Nale*, however, to assess the Guidelines requirement for movement "to a different location," and particularly whether the abduction enhancement may be imposed if the victim was moved only within the confines of a single building.

Such an issue did come before us, however, in a later unpublished decision, *United States v. Coates*, 113 F. App'x 520 (4th Cir. 2004). Coates was convicted of, inter alia, crossing a state line to engage in a sexual act with a minor under twelve, in contravention of 18 U.S.C. § 2241(c). *See Coates*, 113 F. App'x at 521. The evidence established that Coates accosted an eleven-year-old girl in the toy department of a Target store in South Charleston, West Virginia, pretending to be a security guard who suspected the girl of shoplifting; that Coates led the girl to the lawn and garden department, where he threatened her with a knife and sexually assaulted her; that, when customers began approaching the lawn and garden department, Coates moved the girl to the men's clothing department, where he resumed the assault; and that Coates finally concealed the girl inside a rack of clothing, where he concluded the assault and left the girl with instructions not to move until he was out of the store. *Id.*

In calculating Coates's Sentencing Guidelines range, the district court applied a four-level abduction enhancement under the guideline for criminal sexual abuse, USSG § 2A3.1(b)(5) (2003), which (like the abduction enhancement contained in the robbery guideline) is informed by the general definition of "abducted." *See Coates*, 113 F. App'x at 521-22. On appeal, Coates made the contention (similar to Osborne's position herein) that, because he and the victim of his assault "remained inside the Target store, he did not force her to go to a different location, but only shifted the victim from one area to another within the same general location." *Id.* at 522 (internal quota-

tion marks omitted). We rejected Coates's contention and affirmed his sentence, explaining that, "for the [abduction] enhancement to apply, the victim need not have been moved any great distance." *Id.*[11]

Although *Coates* does not constitute controlling precedent, it persuades us that (as a general proposition) an abduction enhancement may properly be applied even though the victim remained within the confines of a single building. We are further persuaded in this regard by the Fifth Circuit's decision in *United States v. Hawkins*, 87 F.3d 722 (5th Cir. 1996). There, the court approved an abduction enhancement under the robbery guideline where two carjacking victims were moved forty to sixty feet at gunpoint within the same parking area, despite the defendant's assertion that the victims "were not forced from one location to another." *Hawkins*, 87 F.3d at 726. The court recognized that — although movement across a threshold from the inside to the outside of a building, or movement across a property line, can be deemed movement "to a different location" — the absence of movement across a building threshold or property line does not bar the conclusion that movement "to a different location" occurred. *Id.* at 727. As the court explained,

> in ordinary parlance "location" is frequently used in reference to a single point where a person is standing, or to one among several rooms in the same structure, or to different floors in the same building. More to the point, we would not be prepared to say, for example, that driving one's vehicle from one parking space in the parking lot at a shopping center to another space in the same parking lot — possibly dozens or even hundreds of yards apart — is not a movement to "a different location," simply because no property line or building threshold has been crossed.

---

[11]Without assessing the propriety of the abduction enhancement, the Supreme Court vacated our *Coates* decision in the wake of *United States v. Booker*, 543 U.S. 220 (2005). *See Coates v. United States*, 125 S. Ct. 1675 (2005). On reconsideration, without revisiting the abduction enhancement, we found *Booker* error and remanded to the district court for resentencing. *See United States v. Coates*, 158 F. App'x 432 (4th Cir. 2005).

*Id.* Accordingly, the *Hawkins* court interpreted the term "a different location," as used in the Guidelines "abducted" definition, "to be flexible and thus susceptible of multiple interpretations, which are to be applied case by case to the particular facts under scrutiny, not mechanically based on the presence or absence of doorways, lot lines, thresholds, and the like." *Id.* at 728.

We agree, not only with the Fifth Circuit's conclusion that movement within the confines of a single building can constitute movement "to a different location," but also with its flexible, case by case approach to determining when movement "to a different location" has occurred. Having so concluded, we turn to the more specific question of whether the sentencing court properly found that Osborne moved the pharmacy employees "to a different location" inside the confines of the Walgreens building.

b.

The district court found that — by forcibly moving pharmacy employees Sword and Mabe from the pharmacy section (through its secured door), across the store area (on a winding course through its aisles), to the front door of the Walgreens building — Osborne moved the employees "to a different location" within the meaning of the Sentencing Guidelines. The court's ruling was not erroneous, in that (on these facts) the pharmacy section and the store area of the Walgreens building can be deemed to be discrete "locations," each being like "one among several rooms in the same structure." *Hawkins*, 87 F.3d at 727; *cf. Coates*, 113 F. App'x at 521-22 (approving abduction enhancement where defendant forcibly moved sexual assault victim between distinct departments in Target store). Indeed, it is in ordinary parlance to say that the pharmacy section and the store area are "different locations" within the Walgreens building. This is especially true in view of the fact that the pharmacy section and the store area are divided by a counter, as well as a secured door intended to be passable only by authorized persons via keypad.[12]

---

[12]The Government maintains that, accepting that the pharmacy section and the store area of the Walgreens building constituted distinct "locations," the district court could have found that Osborne committed the

In challenging the district court's finding of "a different location," Osborne makes several assertions, all of which are unavailing. For example, he contends that, because he moved Sword and Mabe toward their co-workers in the front of the store area, he did not engage in conduct that the abduction enhancement is designed to prevent: the isolation of his victims. *See Whooten*, 279 F.3d at 61 (observing that "the abduction enhancement is intended, at least in part, to protect victims against additional harm that may result from the victim's isolation"); *Saknikent*, 30 F.3d at 1013 (describing "the rationale for the increased penalty" as being that "[a]bduction increases the gravity of sexual assault or other crimes because the perpetrator's ability to isolate the victim increases the likelihood that the victim will be harmed"). In making his assertion in this regard, Osborne brushes off the fact that, in forcing Sword and Mabe to accompany him on his exit path through the Walgreens building, he rendered them potential hostages. In so doing, Osborne engaged in conduct plainly targeted by the abduction enhancement: keeping victims close by as readily accessible hostages. *See Whooten*, 279 F.3d at 61 (recognizing that, by forcing victim outside store and into parking lot at gunpoint, robber "provided himself with a potential hostage" and thereby placed his victim "at risk of harm," including "dangerous consequences of isolation" (internal quotation marks omitted)).

Additionally, Osborne warns us that, if the abduction enhancement is applicable to him, "any movement of a robbery victim at a robber's direction constitutes abduction." Br. of Appellant 14. Osborne's assertion in this regard, however, is simply untrue. Importantly, to abduct a victim within the meaning of the Sentencing Guidelines, an offender must force the victim to *accompany* him to a different location. Thus, for example, a bank's customer service area and its secured vault might be considered "different locations" within the same building, but a robber could not be assigned the abduction enhancement for forcing the movement of a bank teller from the customer service area

---

first of two abductions when, at the outset of the robbery, he forced Sword to accompany him from the store area through the secured door into the pharmacy section. This theory was not, however, the court's basis for imposing the abduction enhancement on Osborne, and we therefore do not assess its merits herein.

to the vault if the robber did not accompany her there. By contrast, Osborne has conceded that he forced Sword and Mabe to accompany him as he made his way from the pharmacy section through the store area to the front door of the Walgreens building, a fact that is pivotal to our conclusion that the district court properly imposed the abduction enhancement on him.

2.

Finally, Osborne contends that the district court improperly assessed a single criminal history point for a prior shoplifting sentence, elevating his criminal history category from II to III (and thus raising the upper end of his advisory Sentencing Guidelines range from 135 months to 151 months). When calculating criminal history points under the Guidelines, prior sentences for misdemeanor and petty offenses are counted, with some limited exceptions. *See* USSG § 4A1.2(c). As relevant here, sentences for certain listed offenses, as well as "*offenses similar to them*, by whatever name they are known, are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." *Id.* § 4A1.2(c)(1) (emphasis added). Among the excepted listed offenses is "[i]nsufficient funds check." *Id.*

Over Osborne's objection, the district court assigned him a criminal history point for a 2005 sentence in a Virginia state court for shoplifting (or, more specifically, for "alter[ing] a price tag on merchandise valued at less than $200"). *See* J.A. 224. Osborne was sentenced on the shoplifting offense to a $176 fine and costs. Relying on section 4A1.2(c)(1)(A) of the Guidelines, Osborne contends that he should not have received a criminal history point for his prior shoplifting sentence because the underlying offense was similar to the listed insufficient funds check offense, and because his sentence did not include any term of probation or incarceration. In drawing similarities between his shoplifting offense and an insufficient funds check offense, Osborne asserts that Virginia defines each of these offenses (where it involves less than $200) as "petty larceny."

We, however, apply an "elements test" in determining whether a prior offense is similar to an excepted listed offense in section

4A1.2(c)(1) — that is, "we compare 'the elements of the prior offense to the elements of the relevant [listed] offense' . . . to determine whether they are 'nearly corresponding' or 'resembling in many respects.'" *United States v. Tigney*, 367 F.3d 200, 201-02 (4th Cir. 2004) (quoting *United States v. Harris*, 128 F.3d 850, 854 (4th Cir. 1997)). And, although we may look to state law to define the elements of the prior offense and (in appropriate circumstances) those of the relevant listed offense, we look to federal law "for the ultimate determination of whether the two offenses are 'similar.'" *Id.* at 202.[13]

It is undisputed that, with respect to his 2005 shoplifting sentence in Virginia, Osborne had been convicted under a Virginia statute making it a crime to, inter alia, "willfully conceal[ ] or take[ ] possession of . . . goods or merchandise of any store," or to "alter[ ] the price tag or other price marking on . . . goods or merchandise," "without authority, with the intention of converting [the] goods or merchandise to his own or another's use without having paid the full purchase price thereof." Va. Code Ann. § 18.2-103. By contrast, Virginia defines its insufficient funds check offense, in relevant part, as follows:

> Any person who, with intent to defraud, shall make or draw or utter or deliver any check, draft, or order for the payment of money, upon any bank, banking institution, trust company, or other depository, knowing, at the time of such making, drawing, uttering or delivering, that the maker or drawer has not sufficient funds in, or credit with, such bank,

---

[13]We resolved in *Tigney* to rely on federal law not only "for the ultimate determination" as to whether an offense listed in section 4A1.2(c)(1) is "similar" to the prior offense in question, but also "to determine the elements of the *listed* offense." 367 F.3d at 202. In *Tigney*, for example, we looked to the federal contempt of court statute to define the listed contempt of court offense. *Id.* There is no federal statute that we can consult here, however, to determine the elements of the listed insufficient funds check offense. We therefore deem it appropriate in this case to look to the Virginia Code (as the law invoked by Osborne) for the definition of the listed insufficient funds check offense. *Cf. United States v. Lopez-Pastrana*, 244 F.3d 1025, 1028 n.4 (9th Cir. 2001) (concluding that, "[w]here there is no federal law on point" defining listed offense, "we may look to either state law or the Model Penal Code").

banking institution, trust company, or other depository, for the payment of such check, draft or order, although no express representation is made in reference thereto, shall be guilty of larceny . . . .

. . . .

Any person making, drawing, uttering or delivering any such check, draft or order in payment as a present consideration for goods or services for the purposes set out in this section shall be guilty as provided herein.

*Id.* § 18.2-181. Thus, under Virginia law, both shoplifting and insufficient funds check offenses may involve the acquisition of a store's merchandise without paying the full purchase price thereof. In a shoplifting offense, this is effectuated by concealing the merchandise or altering the merchandise's price tag. In an insufficient funds check offense, however, the merchandise acquisition is carried out by issuing a bad check. Because of these significant differences, the elements of the shoplifting offense and those of the insufficient funds check offense cannot be deemed "nearly corresponding" or "resembling in many respects." *Harris*, 128 F.3d at 854. As such, the district court correctly determined that Osborne's prior shoplifting offense was not similar to the listed insufficient funds check offense, and the court properly assessed a single criminal history point for the shoplifting sentence.[14]

### III.

Pursuant to the foregoing, we affirm Osborne's conviction on the conspiracy offense, as well as his sentence on the conspiracy, robbery, and drug offenses.

*AFFIRMED*

---

[14]In view of our disposition of this issue, we need not reach the Government's contention that, pursuant to section 4A1.2(c)(1)(B) of the Guidelines, Osborne was not entitled to a criminal history point exception for his prior shoplifting sentence, because the underlying shoplifting offense "was similar to an instant offense," i.e., the robbery offense.