<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-4441**

———————

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

HUMBERTO ROJAS-DIAZ, a/k/a Negro, a/k/a Bruce, a/k/a Lopez,
a/k/a/ Jose,

             Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern
District of North Carolina, at Wilmington.   Terrence W. Boyle,
District Judge.  (7:12-cr-00088-BO-2)

———————

Argued:  December 10, 2015              Decided:  April 5, 2016

———————

Before GREGORY and SHEDD, Circuit Judges, and DAVIS, Senior
Circuit Judge.

———————

Affirmed in part, reversed in part, and vacated and remanded
with instructions by unpublished opinion.  Senior Judge Davis
wrote the opinion, in which Judge Gregory joined.  Judge Shedd
wrote a separate opinion concurring in the judgment.

———————

**ARGUED**: Michael W. Patrick, LAW OFFICE OF MICHAEL W. PATRICK,
Chapel Hill, North Carolina, for Appellant.  Kristine L. Fritz,
OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina,
for Appellee.   **ON BRIEF**:  Thomas G. Walker, United States
Attorney, Jennifer P. May-Parker, Assistant United States

Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Senior Circuit Judge:

A jury convicted Appellant Humberto Rojas-Diaz of conspiring to traffic illegal drugs, conspiring to commit money laundering, substantive money laundering, and attempted drug distribution. He now appeals, challenging the district court's denial of his motion for judgment of acquittal, contending that his convictions for money laundering conspiracy and substantive money laundering are not supported by sufficient evidence. He also argues that the district court committed multiple errors in its jury instructions. Having fully considered his assertions of error, we agree with Rojas-Diaz that the evidence was insufficient to prove his knowing participation in the charged money laundering conspiracy. In all other respects, we discern no error. Accordingly, we affirm in part, reverse in part, and remand for the entry of a judgment of acquittal as to the charge of money laundering conspiracy.

I.

A.

This case arises from a Drug Enforcement Administration ("DEA") investigation of Rojas-Diaz's drug trafficking activity in late 2010. During the investigation, Special Agent Joseph E. Carucci identified James Edward Cox as a courier for Rojas-Diaz, whom Cox knew as "Bruce." On September 8, 2010, Special Agent Carucci surveilled Cox as he travelled to McAllen, Texas, to

3

deliver a boat that had been modified to hold large amounts of marijuana. Once in Texas, Cox delivered the boat to Manuel Tabares-Castillo ("Castillo"). Castillo then gave Cox a cooler lined with ten kilograms of cocaine. DEA agents pulled over Cox in Georgia on September 14, 2010, as he returned from Texas. They searched Cox's vehicle, recovered the cooler, and arrested Cox after discovering the cocaine.

A few weeks after his arrest, Cox agreed to cooperate with the DEA as a confidential informant, working closely with Special Agent Carucci, who would be acting in an undercover capacity. The duo made two trips to Texas as part of the Rojas-Diaz investigation. For the first trip, Rojas-Diaz had asked Cox to retrieve the boat and leave a Fifth Avenue trailer, a type of recreational vehicle, with Castillo so it could be modified to carry marijuana. Cox, at Special Agent Carucci's direction, agreed to make the delivery. Rojas-Diaz then gave Cox $50,000 in cash to pay Castillo for the drugs in the boat.

As planned, Cox and Special Agent Carucci left for Texas with the Fifth Avenue trailer on October 30, 2010, tailed by a surveillance team of DEA agents. They stopped briefly along the way so Cox could meet an unidentified Castillo associate who gave Cox a cooler that had been modified to conceal the $50,000 in its lining. Two days later, Cox and Special Agent Carucci delivered the Fifth Avenue trailer to Castillo at Castillo's

4

house in Texas.  In a hotel parking lot on November 2, 2010, Cox gave Castillo the cooler lined with $50,000.  Cox and Special Agent Carucci returned to North Carolina without the boat, but they had observed several men loading it with marijuana at another location in Texas.

The second trip occurred about a week later.  On November 10, 2010, Rojas-Diaz gave Cox $19,010 to buy a Fleetwood trailer so that it too could be modified and loaded with marijuana.  The intention was to use the Fifth Avenue and Fleetwood trailers in rotation to deliver drugs to North Carolina.  Cox purchased the Fleetwood trailer as directed, then he and Special Agent Carucci delivered it to Castillo in Texas.  While there, Cox and Special Agent Carucci retrieved the boat and began towing it back to North Carolina.  On November 14, 2010, they stopped in Houston, Texas, where Special Agent Carucci confirmed the boat contained marijuana by drilling a hole in its stern.

Because the DEA had planned to use the boat to make a controlled delivery the following day, after which the recipient of the boat would be arrested, Cox and Special Agent Carucci carried out a plan to maintain their cover: Cox got approval from Rojas-Diaz and Castillo to remove sixty pounds of marijuana from the boat with the intention to report back later that he and Special Agent Carucci had sold it.  With the plan underway,

5

Cox and Special Agent Carucci hoped to avert any suspicion that might arise from the anticipated arrests.

Cox and Special Agent Carucci left the boat and remaining marijuana with an associate of Rojas-Diaz in Lumberton, North Carolina. Cox then called Rojas-Diaz and Castillo to confirm that the boat had been delivered. Law enforcement officers stayed behind and surveilled the boat, observing men unloading marijuana from it. As the officers moved in to seize the boat and marijuana, the men fled.

On November 19, 2010, Cox, as planned, told Rojas-Diaz that he and Special Agent Carucci had sold their share of the marijuana. To make it appear that the sale had occurred, Cox and Agent Carucci lined a cooler with $15,000 of government currency and, on November 20, 2010, delivered the cooler to an associate of Castillo in South Carolina. Later, in January 2011, DEA agents found 1300 kilograms of marijuana hidden in the Fifth Avenue trailer in Texas. The Fleetwood trailer was never recovered.

B.

On July 2, 2012, and March 21, 2013, respectively, a grand jury in the Eastern District of North Carolina returned an indictment and a superseding indictment charging Rojas-Diaz and two codefendants with drug-trafficking-related offenses. On April 17, 2013, the grand jury returned a twelve-count second

6

superseding indictment against Rojas-Diaz and five codefendants, Kelly Ray Chavis, James Howell Oxendine, David Prado, William Gerardo Alvarado Parra, and Shane Lorenzo Stewart.

The second superseding indictment charged Rojas-Diaz, specifically, with conspiracy to distribute and to possess with the intent to distribute five kilograms or more of cocaine and 1000 kilograms or more of marijuana in violation of 21 U.S.C. § 846; conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); substantive money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and attempted possession with the intent to distribute 100 kilograms or more of marijuana, and aiding and abetting, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2.* Rojas-Diaz pled not guilty and proceeded to a four-day jury trial.

At trial, Cox and Special Agent Carucci testified as government witnesses about their involvement in the investigation. Castillo also testified as a government witness. Castillo admitted that he had supervised the filling of the boat with marijuana, and he acknowledged that he had worked closely with Cox and that Cox had helped him transport drugs to North

---

* The second superseding indictment also charged Rojas-Diaz with attempted possession with the intent to distribute five kilograms or more of cocaine, and aiding and abetting, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. That charge was dismissed prior to trial.

7

Carolina. But Castillo was adamant that he had never met or spoken to Rojas-Diaz until he was asked to testify in this case.

All but one of the codefendants, David Prado, testified at trial, describing their drug trafficking activities with Rojas-Diaz, whom they knew by different names. Kelly Chavis, who knew Rojas-Diaz as "Bruce," testified that he had been buying marijuana, and occasionally cocaine, from Rojas-Diaz since about 2010. He and Rojas-Diaz were nearby when Cox and Special Agent Carucci delivered the boat in North Carolina. According to Chavis, Rojas-Diaz had positioned himself to watch the delivery, so Rojas-Diaz saw the law enforcement officers seize the boat and the marijuana it contained.

Shane Stewart mostly referred to Rojas-Diaz as "Buddy" and had used Rojas-Diaz as a marijuana supplier. Stewart testified that, at first, Rojas-Diaz had given him thirteen pounds of marijuana, which Stewart sold by that evening. Then, over a two-week period, Rojas-Diaz started fronting Stewart up to fifty pounds of marijuana at a time. The most marijuana Rojas-Diaz ever gave Stewart at one time was ninety pounds.

James Oxendine knew Rojas-Diaz as "Jose." Stewart had introduced Oxendine to Rojas-Diaz, and by 2010, Oxendine was using Rojas-Diaz as a marijuana supplier. Rojas-Diaz fronted Oxendine one to two pounds of marijuana five or six times a year, totaling about twenty pounds of marijuana over the course

8

of their association. Finally, William Parra, who knew Rojas-Diaz as "Negro," met Rojas-Diaz in 2011. Parra testified that he had sold Rojas-Diaz fifty pounds of marijuana for $40,000 on two separate occasions.

After the conclusion of the presentation of evidence, Rojas-Diaz moved for judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29, which the district court denied. Thereafter, the district court, relying "substantially" on the government's proposed instructions, J.A. 526, instructed the jury on the conspiracy charges without mentioning whether a defendant could conspire with government agents. Following an objection by Rojas-Diaz, the district court added an instruction that "[a] person can't conspire with the government." J.A. 590. During the money laundering instructions, the district court described the crime as making "dirty money" clean again and as "hiding" money obtained through criminal activity. J.A. 575, 577-78. But the district court later instructed the jury that the government had to prove "the defendant intended to promote the carrying on of [an] unlawful activity." J.A. 587. In addition, the district court instructed that, "[i]n a conspiracy[,] people can come and go as long as they know the objects of the conspiracy and willfully agree to become a member of it." J.A. 585. The district court defined "willfully" as "an act [that] is committed voluntarily and

9

purposely with the specific intent to do something the law forbids." J.A. 582.

Finally, as to the attempted drug distribution instructions, the district court initially referenced "five kilograms of cocaine," J.A. 585, even though Rojas-Diaz had only been charged with an offense involving 100 kilograms or more of marijuana. Rojas-Diaz objected to the instruction, and the district court correctly named the drug, but not the quantity, for the jury.

On January 19, 2014, the jury found Rojas-Diaz guilty of all charges in the second superseding indictment. After the jury announced the verdict, Rojas-Diaz timely renewed his previous motion for judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29, which the district court denied.

On May 30, 2014, the district court sentenced Rojas-Diaz to 360 months' imprisonment for the drug trafficking conspiracy and attempted drug trafficking convictions, followed by a lifetime of supervised release. For the money laundering conspiracy and substantive money laundering convictions, the district court imposed a concurrent sentence of 240 months' imprisonment followed by three years' supervised release. This timely appeal followed.

10

II.

A.

We review the denial of a motion for judgment of acquittal de novo. United States v. Osborne, 514 F.3d 377, 385 (4th Cir. 2008). In doing so, we view the evidence in the light most favorable to the government to determine whether the guilty verdict is supported by substantial evidence. Id. (citing United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (quoting Burgos, 94 F.3d at 862).

B.

Rojas-Diaz argues that his conviction for money laundering conspiracy should be vacated because the only other identified participants in the ostensible money laundering scheme were government agents. His contention has merit. The second superseding indictment specifically charged Rojas-Diaz with conspiring to launder $19,010 between November 2 and 10, 2010, in promotion of illegal drug trafficking in violation of 18 U.S.C. § 1956(h), as follows:

> Beginning no later than on or about November 2, 2010, and continuing until at least on or about November 10, 2010, in the Eastern District of North Carolina and elsewhere, defendant HUMBERTO ROJAS-DIAZ . . . did knowingly conspire with other persons known

11

and unknown to the Grand Jury to commit an offense in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), specifically, to conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, that is, the transfer of approximately $19,010 in United States currency to another individual known to the Grand Jury, with the intent to promote the carrying on of specified unlawful activity, that is, illegal drug trafficking, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

J.A. 41-42.

To prove the charged conspiracy, the government was required to establish: "(1) an agreement [existing from on or about November 2, 2010, until on or about November 10, 2010,] to commit money laundering existed between one or more persons [to "transfer . . . approximately $19,010 in United States currency"]; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy." United States v. Singh, 518 F.3d 236, 248 (4th Cir. 2008) (brackets added) (quoting J.A. 41). A person, however, cannot conspire with a government agent. United States v. Hackley, 662 F.3d 671, 679 (4th Cir. 2011) (citing United States v. Lewis, 53 F.3d 29, 33 (4th Cir. 1995)). The record here demonstrates that the $19,010 transaction involved solely Rojas-Diaz and government agents. Thus, Rojas-Diaz's conviction

12

for money laundering conspiracy is not supported by sufficient evidence and must be vacated.

As described above, the evidence elicited at trial established that Rojas-Diaz gave Cox $19,010 on November 10, 2010, to purchase the Fleetwood trailer so that it could be modified to transport drugs. Rojas-Diaz also intended the money to cover various expenses incurred while towing the boat, by then filled with marijuana, back to North Carolina. Cox and Special Agent Carucci used the money as instructed. But Cox, a confidential informant, and Special Agent Carucci, working undercover for the DEA, were government agents at the time and could not, as a matter of law, have conspired with Rojas-Diaz to launder the money (or to commit any other criminal offense). There is no evidence that any of the men gave any of the money to another person, government agent or otherwise, who knowingly participated in the scheme.

The government insists that a conspiracy to launder the $19,010 existed between Rojas-Diaz and Castillo, who undoubtedly was involved in the overall narcotics conspiracy and was not a government agent (although he later pled guilty and testified at trial pursuant to a plea agreement). Specifically, the government argues that Castillo had a longstanding arrangement to supply Rojas-Diaz with marijuana and cocaine through a delivery system that involved concealing drugs in modified boats

13

and trailers. In the government's view, the $19,010 was necessary to advance that arrangement. While "[t]he existence of a tacit or mutual understanding is sufficient to establish a conspiratorial agreement," United States v. Kellam, 568 F.3d 125, 139 (4th Cir. 2009) (quoting United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997)), there must be at least some evidence that the defendant participated in the charged conspiracy, United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir. 1984) (citing United States v. Laughman, 618 F.2d 1067, 1075 (4th Cir. 1980)), here, the money laundering conspiracy, not merely the related but legally separate narcotics conspiracy. There simply is no such evidence in this record.

No evidence directly connects Castillo to the $19,010 or to any explicit or implicit agreement as to the use of those funds. There is no evidence that Rojas-Diaz and Castillo discussed the $19,010 before or after Rojas-Diaz gave the money to Cox and Special Agent Carucci. Nor is there evidence that Rojas-Diaz and Castillo discussed purchasing or utilizing the Fleetwood trailer before it arrived at Castillo's house. Nothing demonstrates that Rojas-Diaz acted on anything more than his own accord.

Nor does the record reflect that there exists substantial circumstantial evidence of any collaborative efforts between Rojas-Diaz and Castillo in respect to the money laundering

14

conspiracy. To the contrary, the record underscores that the two men had little, if any, contact with each other. At trial, for example, Castillo was unsure at first whether he had ever spoken to Rojas-Diaz before. Castillo testified about two phone calls that he may have had with Rojas-Diaz, both of which were unhelpful in tying the two men to one another. For the first call, Castillo explained that he talked to "a Mexican guy or Hispanic guy" named "Negro." J.A. 486. Although Parra knew Rojas-Diaz as "Negro," no testimony established that the "Mexican guy or Hispanic guy" on the phone was Rojas-Diaz. Castillo stated that he had never seen Rojas-Diaz before, so he could not "be a hundred percent sure who it was that called." Id. For the second call, Castillo testified that he had "talked to somebody from Houston" once. Id. He added, though, that Rojas-Diaz "was never mentioned to [him] so [he did not] know who that could be." Id. Moreover, Rojas-Diaz is from North Carolina, not Houston.

Castillo did not testify specifically as to when either phone call occurred or the topics discussed. Moreover, Castillo later flatly denied ever knowingly communicating with Rojas-Diaz, testifying that he "never knew [Rojas-Diaz]" and that he had "never seen him before." J.A. 487. Castillo also may not have even been in charge of the drug trafficking enterprise. He asserted that he worked directly with his boss, who was never

15

identified, and Cox, but he never mentioned working for or with Rojas-Diaz. See, e.g., J.A. 485 ("[Cox] told me he had come up to North Carolina to sell [cocaine], . . . and he brought me back $96,000 to give my boss."). For his part, Cox's testimony corroborates that he interacted with Rojas-Diaz and Castillo separately.

The government points to portions of Cox's testimony that suggest Rojas-Diaz and Castillo communicated with each other at various times. See, e.g., J.A. 295 ("I told [Rojas-Diaz] that had he talked to Papa lately and he said – one time he said yeah."). Based on those portions of the trial testimony, the government argues that Rojas-Diaz and Castillo remained in constant contact about their drug trafficking affairs. The cited conversations, however, concern discrete issues, such as ancillary deals involving drugs, Cox's arrest, and money or drugs that Rojas-Diaz supposedly owed Castillo. The conversations do not demonstrate that Rojas-Diaz and Castillo engaged in high-level discussions about the drug trafficking enterprise, and certainly not about the disposition of the proceeds earned from their activities as narcotics traffickers.

Put simply, there is no evidence of a tacit agreement between Rojas-Diaz and Castillo to purchase the Fleetwood trailer; nor is there evidence that Castillo participated in (or even knew about) its purchase. The record before us undoubtedly

16

shows that Rojas-Diaz and Castillo dealt extensively with drugs pursuant to their agreement to do so. It does not, however, show that they conspired to launder the $19,010 specifically charged in the indictment. Cf. United States v. Green, 599 F.3d 360, 372 (4th Cir. 2010) ("[I]t is no exaggeration to observe that, given the manner in which the two overlapping conspiracy counts have been framed in the case before us, virtually all of the evidence presented in support of the drug conspiracy count prosecuted pursuant to 21 U.S.C. § 846 was potentially probative of [the defendant's] alleged involvement in the money laundering conspiracy prosecuted pursuant to 18 U.S.C. § 1956(h)."). Indeed, Castillo does not enter the scene as described in the second superseding indictment until after the trailer arrived at his house, long after any conspiracy involving the purchase of the trailer would have ended and after the money had already been laundered. There is no evidence that he directed the money laundering, caused it to be directed, or knowingly joined in the effort to do so.

For these reasons, Rojas-Diaz's conviction for money laundering conspiracy is not supported by substantial evidence; the district court erred when it denied the motion for judgment of acquittal as to that count of the second superseding indictment.

III.

Rojas-Diaz also challenges his substantive money laundering conviction, arguing that, in turning over the $19,010 to Cox, then a government agent, the crime was never completed. He also asserts multiple errors in the jury instructions. Rojas-Diaz specifically argues that the district court (1) did not properly instruct that a defendant cannot conspire with a government agent; (2) failed to instruct the jury on the willfulness element of a conspiracy; and (3) improperly instructed the jury on concealment money laundering when promotional laundering was charged in the second superseding indictment. We have fully considered these other assignments of error and find they lack merit.

IV.

For the foregoing reasons, we reverse in part the denial of the motion for judgment of acquittal, vacate and remand for entry of an amended judgment of acquittal on the money laundering conspiracy charge, and otherwise affirm the judgment.

AFFIRMED IN PART, REVERSED IN PART,
AND VACATED AND REMANDED WITH INSTRUCTIONS

18

SHEDD, Circuit Judge, concurring:

I concur in judgment of the court. I write separately about the reversal of Rojas-Diaz's conviction on Count 4, an outcome that likely will not alter his term of imprisonment, to articulate my view of the appropriate analysis of the money laundering conspiracy. In my view, the sufficiency of the evidence on Count 4 turns on whether, viewing the evidence in the light most favorable to the Government, a reasonable inference supports finding that Castillo and Rojas-Diaz conspired to use drug proceeds to purchase vehicles—including the Fleetwood trailer listed in Count 4—to further their illegal drug business. If the Government had proven that Castillo and Rojas-Diaz were in such a conspiracy, it would not matter whether Castillo had knowledge of the specific plan to purchase the Fleetwood trailer. That is, the Government "was not required to prove beyond a reasonable doubt [Castillo's] participation [with Rojas-Diaz] in any actual financial transaction knowingly using drug trafficking proceeds." United States v. Green, 599 F.3d 360, 373-74 (4th Cir. 2010).

Here, the Government was unable to articulate how such an inference arises from the evidence presented. Accordingly, I concur fully in the judgment of the court.

19